NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3180-14T1

N.J. HIGHLANDS COALITION
and SIERRA CLUB N.J.,

    Petitioners-Appellants,

v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION and
BI-COUNTY DEVELOPMENT CORP.,

    Respondents-Respondents.

_____

APPROVED FOR PUBLICATION

DECEMBER 13, 2018

APPELLATE DIVISION

Argued February 15, 2017 — Decided August 4, 2017

Before Judges Fuentes, Simonelli and Carroll.

On appeal from the New Jersey Department of Environmental Protection.

Susan J. Kraham argued the cause for appellants (Columbia Environmental Law Clinic, attorneys; Ms. Kraham and Edward Lloyd, on the briefs).

Timothy P. Malone, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Christopher S. Porrino, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Mr. Malone, on the brief).

David R. Oberlander argued the cause for respondent Bi-County Development Corp. (Bisgaier Hoff, LLC, attorneys; Mr. Oberlander, on the brief).

The opinion of the court was delivered by SIMONELLI, P.J.A.D.

Appellants N.J. Highlands Coalition and Sierra Club, N.J. challenge a settlement agreement between respondents New Jersey Department of Environmental Protection (DEP) and Bi-County Development Corp. (Bi-County) relating to Bi-County's development of a 204-unit inclusionary housing project in the Borough of Oakland (Oakland). Appellants also appeal from DEP's approval of two freshwater wetlands general permits and a transition area waiver. We affirm.

I.

Bi-County owns approximately eighty-five acres of land in Oakland (the property). Because the property is located in the Highlands Region, see N.J.S.A. 13:20-7(a)(1), it is subject to the restrictions of the Highlands Water Protection and Planning Act (Highlands Act), N.J.S.A. 13:20-1 to -35. The property serves as habitat for the threatened species Barred Owl, see N.J.A.C. 7:25-4.17 (classifying Barred Owl as a threatened species), and the DEP designated the wetlands on the property as being of exceptional resource value.

In 1987, Bi-County filed a lawsuit against Oakland and the Oakland Planning Board (Planning Board) under the Mt. Laurel

doctrine[1] seeking a builder's remedy authorizing construction of 700 residential units on the property, which would include affordable housing. In January 1991, the parties executed a settlement agreement, which required Oakland to re-zone the property to permit construction of an inclusionary housing development of up to 370 residential units, with some designated for affordable to low or moderate-income households (the Mt. Laurel settlement). The Mt. Laurel settlement also required Oakland to cooperate and expeditiously resolve any issues regarding sewer service, and acknowledged that Oakland had already submitted a wastewater management plan to DEP to authorize sanitary sewer service for the project through a connection to the municipal sewer system operated by the adjacent Township of Wayne (Wayne). As a result of the settlement, the parties filed a stipulation of dismissal, dismissing the litigation.

In February 1991, the property was placed in an approved sewer service area by virtue of DEP's inclusion of the Oakland wastewater management plan as an amendment to the Northeast Water Quality Management Plan (the 1991 WQMP amendment). The 1991 WQMP

---

[1] See S. Burlington Cty. NAACP v. Twp. of Mt. Laurel, 67 N.J. 151, cert. denied, 423 U.S. 808, 96 S. Ct. 18, 46 L.Ed.2d 28 (1975).

amendment allowed for treatment of wastewater from the property at the Mountain View Sewage Treatment Plant located in Wayne.

In 1998, Bi-County contracted to sell the property to Pinnacle Communities, LTD (Pinnacle).  In March 1999, Pinnacle applied to the Planning Board for site plan approval for development of a 313-unit inclusionary housing project.  The project proposed a fifty-foot transition area surrounding the freshwater wetlands on the property, as then required by a freshwater wetlands letter of interpretation (LOI)[2] the DEP issued in 1989 and reissued in 1997, which classified the wetlands on the property as being of intermediate resource value.

Pinnacle and Bi-County filed a lawsuit against Oakland and Wayne for issues related to the property.  In 2001, the trial court ordered Wayne to accept wastewater from the property, and ordered Oakland and Wayne to execute a municipal services agreement to provide for such wastewater service.

In 2003, Pinnacle applied to DEP for a new LOI because the two prior LOIs had expired.  During DEP's review of the application, it informed Pinnacle that the wetlands on the property

---

[2]  An LOI delineated the extent of regulated freshwater wetlands and transition areas on a site.  See N.J.S.A. 13:9B-8.  Transition areas are regulated areas adjacent to freshwater wetlands that serve as a buffer between wetlands and uplands.  See N.J.S.A. 13:9B-16.  The width of a transition area depends on the resource value classification of the adjacent wetland.  See ibid.

were habitat for the Barred Owl, and thus, the project required a 150-foot transition area surrounding the freshwater wetlands on the property instead of the proposed fifty-foot transition area.

Pinnacle contested DEP's determination and submitted a report from its consultant, who concluded Barred Owls were not present on the property. In response, Wayne submitted a report from its consultant, who concluded the site contained Barred Owls and had a documented record of serving as Barred Owl habitat. The consultant also concluded that the wetlands on the property should be classified as exceptional resource value, which Pinnacle's consultant disputed.

DEP determined that the property served as Barred Owl habitat and re-classified the wetlands on the property as being of exceptional resource value. Exceptional resource value wetlands require a 150-foot transition area adjacent to the wetlands. See N.J.A.C. 7:7A-2.5(d).[3] Because of this 150-foot transition area requirement, the development of 313 units was no longer possible. However, DEP determined that if the project was redesigned to

---

[3] The regulations governing the implementation of the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, and the New Jersey Water Pollution Act, N.J.S.A. 58:10A-1 to -73, were recodified as N.J.A.C. 7:7A-1.1 to 22.20 and amended by R. 2017, d. 243, effective December 18, 2017. We shall refer herein, in text, to the regulations in effect on March 12, 2015, the date this appeal was filed.

incorporate a larger transition area and preserve approximately sixteen acres of uplands pursuant to a comprehensive conservation plan (CCP), this would preserve the property's Barred Owl habitat function and allow Pinnacle or Bi-County to obtain the required approvals and waivers under the Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30, and the Flood Hazard Area Control Act, N.J.S.A. 58:16A-50 to -103.

In 2004, DEP issued an LOI, which re-classified the wetlands on the property as being of exceptional resource value, requiring a 150-foot transition area (the 2004 LOI). Pinnacle submitted a CCP to DEP that proposed reducing the project from 313 units to 209 units and preserving sixteen acres of forested uplands as a corridor for the Barred Owl to travel between larger forested areas to the north and south. Pinnacle also submitted redesign plans to the Planning Board to reflect the increased transition area required by the 2004 LOI and CCP, and reduction in the size of the project from 313 units to 209 units.

The Legislature passed the Highlands Act in 2004. The Legislature found the Highlands to be critically important to New Jersey because they provide drinking water for approximately one-half of the State's population. Thus, the Legislature declared that preservation of the Highlands "cannot be left to the uncoordinated land use decisions of [eighty-eight] municipalities,

seven counties, and a myriad of private landowners[.]" N.J.S.A. 13:20-2. Instead of permitting decentralized protection, the Legislature established the Highlands Water Protection and Planning Council (Highlands Council) to oversee New Jersey's portion of the national Highlands Region. N.J.S.A. 13:20-4. The Highlands Council is responsible for developing a regional master plan and overseeing development in the Highlands Region. N.J.S.A. 13:20-6 and -8.

The Highlands Act exempts certain development activities from its restrictions, including:

> a major Highlands development . . . that on or before March 29, 2004 has been the subject of a settlement agreement and stipulation of dismissal filed in the Superior Court . . . to satisfy the constitutional requirement to provide for the fulfillment of the fair share obligation of the municipality in which the development is located.
>
> [N.J.S.A. 13:20-28(a)(17) (emphasis added).]

The exemption "expire[s] if construction beyond site preparation does not commence within three years after receiving all final approvals required pursuant to the 'Municipal Land Use Law,' [(MLUL), N.J.S.A. 40:55D-1 to -22]." Ibid. (emphasis added).

Pinnacle sought a Highlands applicability determination from DEP that the project was exempt from the Highlands Act under N.J.S.A. 13:20-28(a)(17). Pinnacle also sought a WQMP consistency

determination, and applied to the Planning Board for approval of a 209-unit development plan.

In June 2005, DEP determined that Bi-County was entitled to the exemption under N.J.S.A. 13:20-28(a)(17) based on the Mt. Laurel settlement and stipulation of dismissal. However, DEP found, incorrectly, that the proposal was inconsistent with the Northeast WQMP. Both DEP and Pinnacle had overlooked the 1991 WQMP amendment, which already provided for treatment of wastewater from the property, and mistakenly believed the property was located outside of a sewer service area. As a result, Pinnacle applied for a WQMP amendment to extend Wayne's Mountain View Wastewater Treatment Facility's sewer service area to include the property. DEP rejected the application and expressed concern about the project's impacts on the Barred Owl, among other things. Pinnacle contested DEP's determination, and the matter was transferred to the Office of Administrative Law (OAL) for a hearing.

Meanwhile, in July 2007, the Planning Board granted preliminary and final major site plan approval and all variances and waivers for the construction of 209 units on the property, with sixteen units set aside for affordable housing and twelve units set aside for senior housing (the 2007 approval). The Planning Board conditioned the 2007 approval on Pinnacle obtaining all necessary approvals from DEP and the Bergen County Planning

Board (County Planning Board), and satisfying more than fifty additional conditions. The 2007 approval also required Pinnacle to return to the Planning Board for amended site plan approval if DEP required additional transition areas or placed any further restrictions on the proposed development.

In July 2007, Pinnacle applied to DEP for freshwater wetlands general permit 6, which authorizes certain activities in non-tributary wetlands, see N.J.A.C. 7:7A-5.6, and freshwater wetlands general permit 11, which authorizes activities necessary to construct stormwater outfall and intake structures. See N.J.A.C. 7:7A-5.11. Pinnacle also applied for a transition area waiver. DEP determined that in lieu of general permit 6, Pinnacle had to obtain general permit 10B, which authorizes the building of minor road crossings in wetlands and transition areas. See N.J.A.C. 7:7A-5.10B.

Pinnacle terminated the purchase contract and returned the property to Bi-County. In February 2009, Bi-County applied to DEP for an extension of the 2004 LOI. DEP granted an extension in November 2009, but again determined the property contained exceptional resource value wetlands that served as habitat for threatened and endangered (T&E) species. Bi-County contested DEP's determination, and the matter was transferred to the OAL and consolidated with the other OAL matter.

While the OAL matters were pending, the Highlands Council reviewed Bi-County's project plan and compared it with the Regional Master Plan (RMP). The Highlands Council recommended that DEP not approve Bi-County's application to extend the 2004 LOI unless it was modified to address three inconsistences: (1) the project encroaches into the 300-foot buffers/riparian areas, and this was inconsistent with the objectives of the final draft RMP; (2) the project disturbs the Barred Owl and any disturbance to the mapped habitat for Barred Owls will result in forest fragmentation;[4] and (3) the project's proposed water use was inconsistent with the RMP both because it exceeds the 27,600 gallons per day in conditionally available water for the three subwatersheds and did not provide the 125% mitigation of the depletive water uses. See N.J.S.A. 13:20-10 (stating goals of the RMP).

DEP and Bi-County discussed settlement of the OAL matters. During their discussions, Bi-County informed DEP of the 1991 WQMP amendment. DEP determined that the 1991 WQMP amendment was still in effect as it pertained to the property, and conceded it had

---

[4]  The Convention on Biological Diversity, a convention of the United Nations that includes the United States, defines "forest fragmentation" as "any process that results in the conversion of formerly continuous forest into patches of forest separated by non-forested lands." Convention on Biological Diversity, *Forest Biodiversity                            Definitions*, https://www.cbd.int/forest/definitions.shtml [http://archive.is/xqLLN] (last visited July 24, 2017).

erred in 2005 when it found Bi-County's proposal was inconsistent with the Northeast WQMP. DEP also determined that the Highlands Act exemption under N.J.S.A. 13:20-28(a)(17) had not expired because Bi-County had not yet obtained all final approvals required under the MLUL. After resolving these issues, only one issue remained: whether DEP should grant Bi-County's freshwater general permit application and issue general freshwater wetland permits 10B and 11, and a transition area waiver.

In October 2012, Bi-County submitted to DEP a permitting plan, which revised the project in the area subject to the requirements of general freshwater wetlands permit 10B. The revision would change the site plan by reducing the project from 209 units to 204 units.

On January 28, 2014, DEP and Bi-County executed a settlement agreement that provided for issuance of the two general permits and transition area waiver (the DEP settlement). Under the DEP settlement, Bi-County agreed to withdraw the OAL matters, revise its plans to satisfy all regulatory requirements for issuance of the general permits, and obtain any other approvals required by local, state, or federal law. Bi-County also agreed to revise its freshwater wetlands permit application so that the application satisfied FWPA regulations, reduce the number of units from 209 to 204, and revise its CCP to conform to the permitting plan.

11                                    A-3180-14T1

DEP agreed to amend its records to reflect the property's inclusion in Wayne's sewer service area, and refrain from adopting any WQMP amendments changing this designation so long as Bi-County's development proposal remained exempt under the Highlands Act. DEP determined that the presence of documented Barred Owl habitat and exceptional resource value wetlands on the property would be adequately protected and thereby not preclude approval of the freshwater wetlands permit application. DEP also determined that Bi-County was entitled to the Highlands Act exemption under N.J.S.A. 13:20-28(a)(17) because the property was developed in accordance with the Mt. Laurel settlement, and the Planning Board's July 2007 approval was not a final approval within the meaning of N.J.S.A. 40:55D-4 until Bi-County satisfied the conditions of the approval, including issuance of the general permits. DEP found that the 2007 approval was not a final approval because Bi-County had to amend its site plan to reflect the terms and conditions of the required DEP approvals.

In October 2014, Bi-County submitted a revised compliance statement for its freshwater permit application. DEP reviewed the application, paying particular attention to the potential impacts on Barred Owl habitat. Christina Albizati, an Environmental Specialist with a decade of experience in DEP's T&E Species Unit, led this review and documented her findings. She found that the

permits would only disturb less than a quarter acre of wetlands, while the transition area waiver would reduce 1.718 acres of transition area in order to facilitate the construction of several single-family dwellings and a detention basin. She determined that the loss of less than a quarter acre of wetland habitat did not destroy, jeopardize, or adversely modify the documented Barred Owl habitat when the habitat consisted of 400 acres.

Further, as compensation for the lost 1.718 acres, Bi-County agreed to expand the wetland transition area in other locations on-site by 1.363 acres and preserve 16.81 acres of additional forested uplands that were suitable for Barred Owl habitat. These forested uplands would not otherwise receive protection under the FWPA.

DEP concluded that the project was consistent with FWPA regulations. DEP determined that the preserved 16.81 acres of upland forest areas would not only substantially offset the relatively small loss of Barred Owl habitat in regulated areas, but would also provide an added level of habitat protection by serving as a buffer from forthcoming development.

The U.S. Fish and Wildlife Service (USFWS) reviewed the settlement agreement and submitted comments to DEP. USFWS noted that the property lies within the summer migratory range for the

Indiana Bat[5] and the Northern Long-Eared Bat,[6] and may serve as habitat for the Small-Whorled Pogonia.[7]

---

[5] New Jersey lists the Indiana Bat as endangered. N.J.A.C. 7:25-4.13. The Indiana Bat is a small bat with dark-brown or black fur. The bats became endangered in 1967 because "people disturb[ed] hibernating bats in caves during winter, resulting in the death of large numbers of bats." U.S. Fish & Wildlife Service, *Indiana Bat (Myotis sodalis)*, https://www.fws.gov/midwest/endangered/mammals/inba/index.html [http://archive.is/imkIz] (last updated July 19, 2016). The "bats are vulnerable to disturbance because they hibernate in large numbers in only a few caves[.]" Ibid. "Other threats that have contributed to the Indiana [B]at's decline include commercialization of caves, loss of summer habitat, pesticides and other contaminants, and most recently, the disease white-nose syndrome." Ibid.

[6] The Northern Long-Eared Bat "is a medium-sized [brown] bat" that "is distinguished by its long ears[.]" White-nose syndrome is also responsible for its threatened status. U.S. Fish & Wildlife Service, *Northern Long-Eared Bat (Myotis septentrionalis)* (Apr. 2015), https://www.fws.gov/Midwest/endangered/mammals/nleb/pdf/NLEBFactSheet01April2015.pdf . It "was listed as threatened under the Endangered Species Act on April 2, 2015." U.S. Fish & Wildlife Service, *Northern Long-Eared Bat (Myotis septentrionalis)*, https://www.fws.gov/midwest/endangered/mammals/nleb/index.html [http://archive.is/7EK0n] (last updated Sept. 2, 2016).

[7] The Small Whorled Pogonia is "a threatened species" and "a member of the orchid family." The agency states that "[t]he primary threat to the small whorled pogonia is the past and continuing loss of populations when their habitat is developed for urban expansion." U.S. Fish & Wildlife Service, *Small Whorled Pogonia (Isotria medeoloides)* (Feb. 2016), https://www.fws.gov/midwest/endangered/plants/pdf/smallwhorledpogoniafctsht.pdf.

A-3180-14T1

On February 14, 2015, DEP issued general permits 10B and 11 and a transition area waiver, which incorporated the conditions that USFWS requested. The general permits imposed bat and plant pre-construction survey requirements; required the surveys to be submitted to and approved by USFWS; and placed timing limits on tree-clearing to protect migrating and foraging bat species.

## II.

On appeal, appellants contend that DEP erred as a matter of law in determining that the 2007 approval was not a final approval within the meaning of N.J.S.A. 40:55D-4. Appellants posit that the 2007 approval was a final approval because the Planning Board took official action preliminarily approving a site plan; although the official action was conditional, it conferred on Bi-County all rights attendant to a final approval; and those rights vested on the date of the final approval regardless of whether there were conditions of approval.[8] Accordingly, appellants conclude that because the 2007 approval was a final approval and Bi-County failed to begin construction, Bi-County was not entitled to the exemption.

---

[8] Appellants rely on an unpublished opinion from this court to support this argument; however, unpublished opinions do not constitute precedent and are not binding on us. R. 1:36-3; Trinity Cemetery Ass'n v. Twp. of Wall, 170 N.J. 39, 48 (2001). Appellants also rely on a published trial court opinion; however, trial court opinions are not binding on us. S & R Assocs. v. Lynn Realty Corp., 338 N.J. Super. 350, 355 (App. Div. 2001).

Our role in reviewing an administrative agency's decision is limited. Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103 (1985). We will not reverse the agency's decision unless: (1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record. Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007).

"In reviewing an administrative agency's decision, we will grant considerable deference to the agency's expertise, where such expertise is a relevant factor." In re Petition of S. Jersey Gas Co., 447 N.J. Super. 459, 480 (App. Div. 2016). "We may not second-guess those judgments of an administrative agency which fall squarely within the agency's expertise." In re Stream Encroachment Permit No. 0200-04-0002.1 FHA, 402 N.J. Super. 587, 597 (App. Div. 2008).

"Ordinarily, DEP is given great deference when it applies its considerable expertise and experience to the difficult balance between development and conservation." Ibid. (quoting Crema v. N.J. Dep't of Envtl. Prot., 192 N.J. Super. 505, 510 (App. Div. 1984)). "However, '[w]hile we must defer to the agency's expertise, we need not surrender to it.'" Pinelands Pres. All.

A-3180-14T1

v. State, Dep't of Envtl. Prot., 436 N.J. Super. 510, 524 (App. Div.) (alteration in original) (quoting N.J. Chapter of Nat'l Ass'n of Indus. & Office Parks v. N.J. Dep't of Envtl. Prot., 241 N.J. Super. 145, 165 (App. Div. 1990)), certif. denied, 220 N.J. 40 (2014). "The party who challenges DEP's decision to permit development of a certain location has the 'burden of demonstrating, not that the agencies' action was merely erroneous, but that it was arbitrary.'" Stream Encroachment Permit, supra, 402 N.J. Super. at 597 (quoting Crema, 192 N.J. Super. at 510).

Furthermore, although we "must give deference to the agency's findings of facts, and some deference to its 'interpretation of statutes and regulations within its implementing and enforcing responsibility,' we are 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.'" Utley v. Bd. of Review, Dep't of Labor, 194 N.J. 534, 551 (2008) (citation omitted) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997); Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)). Applying the above standards, we discern no reason to disturb DEP's decisions.

The MLUL defines "final approval" as:

> the official action of the planning board
> taken on a preliminarily approved major
> subdivision or site plan, after all

> conditions, engineering plans and other
> requirements have been completed or fulfilled
> and the required improvements have been
> installed or guarantees properly posted for
> their completion, or approval conditioned upon
> the posting of such guarantees.
>
> [N.J.S.A. 40:55D-4 (emphasis added).]

See Field v. Mayor & Council of Franklin, 190 N.J. Super. 326, 332 (App. Div. 1983).

Here, the Planning Board approved the proposed development, but conditioned its approval on Bi-County satisfying fifty-seven conditions, several of which remained unsatisfied when DEP issued the general permits and transition area waiver. Among these outstanding conditions were the County Planning Board's approval of the site plan and issuance of all necessary DEP approvals, both of which the MLUL requires. See N.J.S.A. 40:55D-22(b); N.J.S.A. 40:55D-50(b).

Moreover, the 2007 approval was for the development of 209 units. DEP required Bi-County to revise the project area subject to the requirements of freshwater wetlands permit 10B. The revision changed the site plan by reducing the proposed development from 209 units to 204 units. The 2007 approval required Bi-County to return for amended site plan approval if DEP imposed additional conditions or other restrictions on the proposed development, which the DEP did here. Thus, the 2007 approval was not a "final

approval" because Bi-County had not received "all final approvals required pursuant to the [MLUL]," N.J.S.A. 13:20-28(a)(17), and final site plan approval for 204 units. Accordingly, DEP correctly concluded that Bi-County was entitled to the exemption under N.J.S.A. 13:20-28(a)(17).

## III.

Appellants challenge DEP's determination that Bi-County's permitting plan adopted in the DEP settlement complied with the FWPA's general wetlands permit provisions. They argue that DEP acted arbitrarily and capriciously by determining that Bi-County's permitting plan adequately protected threatened Barred Owl habitat. Appellants posit that granting the general permits will cause forest fragmentation and thus endanger the Barred Owl in violation of N.J.A.C. 7:7A-4.3(b)(3). They note that the permits allow for the removal of a small area of wetlands, and risk rendering the remainder of the forest patch unusable as Barred Owl habitat because the owls shun human activity by avoiding residential, industrial, or commercial areas. Appellants also note the Highlands Council found the project jeopardizes Barred Owl habitat.

Appellants also argue that DEP acted arbitrarily and capriciously by failing to make findings as to whether Bi-County's permitting plan will jeopardize the continued existence of the

Barred Owl. They point to the fact that DEP previously determined that the property served as habitat for the threatened Barred Owl, but then conveniently failed to make any finding as to whether the project jeopardized the Barred Owl's continued existence.

Further, appellants maintain that because Bi-County was already required to preserve uplands forest in order to meet the requirements of general permit 10B, DEP erred when it conditioned acceptance of Bi-County's permitting plan on Bi-County mitigating harms to Barred Owl habitat. Even if proper, appellants posit that the preservation would not prevent forest fragmentation.[9]

The "Legislature passed the [FWPA] in 1987 as a means of protecting and regulating New Jersey's sensitive freshwater wetlands." N.J. Dep't of Envtl. Prot. v. Huber, 213 N.J. 338, 341 (2013) (citing N.J.S.A. 13:9B-1 to -30; In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 482 (2004)). When it passed the FWPA, the Legislature found, among other things, that "freshwater wetlands [(1)] protect and preserve drinking water supplies by [serving to purify surface water and groundwater resources;] [and (2)] provide essential breeding, spawning, nesting, and wintering habitats for a major portion of the State's fish and wildlife[.]"

---

[9] Appellants erroneously assert that the presence of a threatened or endangered species triggers the stringent requirements of N.J.A.C. 7:7A-4.3(d); however, this regulation is inapplicable because it governs timing requirements on fisheries.

<u>Id.</u> at 343 (quoting <u>In re Freshwater Wetlands Prot. Act Rules</u>, 238 <u>N.J. Super.</u> 516, 519 (App. Div. 1989)).

Because of the wetlands' great importance, the Legislature announced "it shall be the policy of the State to preserve the purity and integrity of freshwater wetlands from random, unnecessary or undesirable alteration or disturbance[.]" <u>N.J.S.A.</u> 13:9B-2. At the same time, the Legislature cautioned that "the rights of persons who own or possess real property affected by this [A]ct must be <u>fairly recognized and balanced with environmental interests</u>[.]" <u>Ibid.</u> (emphasis added).

Following the FWPA's enactment, DEP promulgated regulations interpreting the statute. Most relevant to this case, DEP promulgated <u>N.J.A.C.</u> 7:7A-4.3, which governs all general permit authorizations. The regulation declares that "[t]he activities [authorized by a general permit] shall not destroy, jeopardize, or adversely modify a present or documented habitat for threatened or endangered species; and shall not jeopardize the continued existence of any local population of a threatened or endangered species[.]" <u>N.J.A.C.</u> 7:7A-4.3(b)(3).

An applicant must also meet additional requirements depending on the permit sought. General permits 10B and 11 specifically require that "[m]itigation . . . be performed for all permanent loss and/or disturbance of 0.1 acres or greater of freshwater

wetlands or State open waters." N.J.A.C. 7:7A-5.10B(e); N.J.A.C. 7:7A-5.11(i). N.J.A.C. 7:7A-15.5 establishes the degree of mitigation required for disturbances of less than 1.5 acres.

These regulations required Bi-County to preserve at least five acres of uplands because the project disturbed less than 1.5 acres of exceptional resource value freshwater wetlands and upland preservation was practicable and feasible. N.J.A.C. 7:7A-15.9; N.J.A.C. 7:7A-15.5. Bi-County complied with the regulations by allocating five acres of the 16.81 acres of preserved forested uplands as mitigation.

In the DEP settlement, DEP determined that the revised project would satisfy regulatory requirements for issuance of the required general permits and that due to Bi-County's CCP, the presence of documented Barred Owl habitat and exceptional resource value wetlands on the property would not preclude approval of the general permit application. The CCP reengineered the entire project to increase wetlands transition areas, conserve sixteen acres of uplands, and reduce the project's size by approximately one-third. The CCP also proposed a monitoring program for the Barred Owl and species of special concern to determine the patterns of use of the subject property.

DEP's T&E Unit also thoroughly reviewed Bi-County's general permit application to determine the project's potential impact on

Barred Owl habitat. The T&E Unit recognized that the general permits would authorize a disturbance of .1984 acres of wetland and the waiver would result in a net loss of .335 acres of habitat, but found that

> this relative[ly] small loss of habitat is more than offset by the supplemental preservation of 16.81 acres of suitable upland forest habitat proximate to the wetlands . . . . [T]he preservation of the forested steep slope areas on [the] site[,] through [the] creation of conservation areas, not only preserves habitat for [B]arred [O]wl[s], but also provides an additional level of habitat protection by serving as a screen from the forthcoming development.

Based on its findings, the T&E Unit concluded:

> [T]he proposed plan is consistent with the standards of subchapters 5 and 6 of the [FWPA] Rules. . . . [T]he amount of wetland and transition area habitat being lost to development is minor in comparison to the amount of wetland and transition areas that remain and that will be preserved. In combination with the additional upland conservation areas onsite, the forested wetlands on [the] site will still retain the same structure and function they did prior to development and will still be able to provide [B]arred [O]wl[s] with necessary habitat components without threatening the existence of the population in the area.

Further, when DEP responded to the public's comments, it expressly incorporated by reference the T&E Unit's report, and addressed the public's concerns for the Barred Owl and forest fragmentation. DEP stated:

23                                      A-3180-14T1

After a thorough review of all relevant documentation, the T&E Unit finds the proposed plan is consistent with the standards of [N.J.A.C. 7:7A-4.3(b)], as the proposed plan would not appreciably result in increases in sediment, nutrient or pollutant loading and/or degrade water quality in the wetland that would result in an alteration of the wetlands' ability to provide suitable habitat for the [B]arred [O]wl. In regard to impacts to the wetland habitat of the [B]arred [O]wl, the plan will result in a net loss of 0.355 acre[s] of habitat within the transition area of the largest wetlands onsite. However, the T&E Unit has determined that this relatively small loss of habitat is more than offset by the supplemental preservation of 16.81 acres of suitable upland forest habitat, which is proximate to wetlands and within the same Barred [O]wl habitat. . . . The T&E Unit has determined that the preservation of forested steep slope areas on site through [the] creation of conservation areas not only preserves habitat for [B]arred [O]wl, but also provides an additional level of habitat protection by serving as a screen from the forthcoming development. While the proposed development project will segment the forested habitat on-site, the amount and quality of remaining forest, both upland and wetland, will continue to provide suitable habitat for the [B]arred [O]wl. As a result, the [B]arred [O]wl can still use the remaining wetlands and the preserved forested areas for resting and foraging, and the remaining on-site habitat will also serve as a corridor to habitat south and north of the parcel.

[(Emphasis added).]

The record confirms that DEP carefully considered the project's impacts on the Barred Owl and reasonably approved the general permits. Unlike DEP, appellants may believe that the land

lost to Bi-County's development is too great.  Appellants' mere disagreement, however, does not make DEP's determination arbitrary, capricious, or unreasonable.  The Legislature tasked DEP with balancing environmental and real property interests.  N.J.S.A. 13:9B-2.  The DEP settlement and general permits represent DEP's reasonable attempt to strike this balance.  The record amply supports DEP's decision to approve the general permits; the DEP's decision comports with the requirements of the FWPA and corresponding regulations; and the decision was not arbitrary, capricious, or unreasonable.

IV.

Appellants contend that DEP unreasonably ignored evidence that the property serves as habitat for the federally-endangered Indiana Bat and Northern Long-Eared Bat, and federally-threatened Small-Whorled Pogonia.  Appellants argue that DEP failed to consider that USFWS identified the exceptional resource value wetlands on the property as habitat for these species, and the DEP settlement never mentioned them.  Appellants also argue that USFWS's comments raised concerns that the project occurs within the summer migratory range of the endangered Northern Long-Eared Bat, and lies within a maternity colony buffer.  Finally, appellants note that USFWS requested surveys for the Northern Long-Eared Bat and Small-Whorled Pogonia.

25

Bi-County's CCP, which the DEP settlement expressly incorporated by reference, acknowledged there were other T&E species on the property. The CCP states that the "Barred Owl should be the main focus of the monitoring program[,] but not the exclusive purpose" because "[s]pecies of special concern identified or potential . . . should also be a focus of a baseline monitoring program."

Second, although the DEP settlement does not expressly reference the Indiana Bat, DEP considered the project's impact on T&E species other than the Barred Owl, including the Indiana Bat, Northern Long-Eared Bat, and Small-Whorled Pogonia. In its response to public comments, DEP acknowledged that these three species might live on the property and informed the public how they would be protected:

> The site has been identified as potential habitat for Indiana [B]at, [N]orthern [L]ong-[E]ared [B]at, and [S]mall-[W]horled [P]ogonia by the [USFWS], and the USFWS is requesting that the site be surveyed for these species. [DEP] has informed Bi-County of the USFWS requirement to survey for these species. Bi-County will be required to complete these surveys and adhere to any subsequent USFWS recommendations as a condition of any Freshwater Wetlands permits for the [P]roject and prior to any site disturbance or construction.
>
> [(Emphasis added).]

Lastly, in the general permits, DEP expressly prohibited Bi-County from removing trees before finishing the surveys; required Bi-County to seek approval from USFWS before clearing any trees; and barred Bi-County from clearing trees during the Indiana Bat's foraging and pre-hibernation period. The record contains ample evidence that DEP considered T&E species in issuing the general permits and imposed reasonable permit conditions to protect them.

V.

Appellants contend that DEP acted arbitrarily and capriciously in granting a transition area waiver. They argue that the project will result in a net loss of 0.355 acres of transition area around the exceptional resources value wetlands on the property, which is inconsistent with N.J.A.C. 7:7A-6.1(a)(1)-(6). They argue that the record contains no evidence to substantiate DEP's determination because Bi-County failed to offer scientific documentation showing the proposed activity will have no substantial impact on the adjacent wetlands, as required by N.J.A.C. 7:7A-6.1(d).

Appellants also argue that rather than provide the documentation necessary to secure a transition area waiver, the DEP settlement proposed to compensate for the loss of requisite 150-foot transition area by preserving 11.61 acres of forested uplands on the property. They posit that DEP erred in issuing the

transition area waiver because such an exchange does not obviate the requirements of N.J.A.C. 7:7A-6.1(d), and does not satisfy the legislative purpose of protecting freshwater wetlands species.

A transition area is "an area of land adjacent to a freshwater wetland which minimizes adverse impacts on the wetland or serves as an integral component of the wetlands ecosystem." N.J.S.A. 13:9B-3. DEP regulations require that "[t]he standard width of a transition area adjacent to a freshwater wetland of exceptional resource value shall be 150 feet . . . [and] shall only be modified through the issuance of a transition area waiver." N.J.A.C. 7:7A-2.5(d).

N.J.S.A. 13:9B-18(a) empowers DEP to issue a transition area waiver when: "(1) the proposed activity would have no substantial impact on the adjacent freshwater wetland or (2) the waiver is necessary to avoid a substantial hardship to the applicant caused by circumstances peculiar to the property." Corresponding DEP regulations provide that an applicant may satisfy the first prong and "obtain a transition area waiver through scientifically documenting that a proposed activity will have no substantial impact on the adjacent wetlands." N.J.A.C. 7:7A-6.1(d). The documentation "may include, but is not limited to, nutrient or sediment transport models, buffer models, or wildlife habitat suitability studies." Ibid. (emphasis added). However, the

28

documentation must address sediment, nutrient, and pollutant transport and removal; impacts on sensitive species; and surface water quality impacts. Ibid.

DEP granted a transition area waiver to Bi-County under N.J.A.C. 7:7A-6.1(d). Bi-County's compliance statement, which it revised in October 2014, demonstrates that DEP acted properly under N.J.S.A. 13:9B-18 and N.J.A.C. 7:7A-6.1(d) in granting the transition area waiver. In its compliance statement, Bi-County cited N.J.A.C. 7:7A-6.1(d) in its entirety and described the project's impact on sediments, nutrients, and pollutants, sensitive species, and water quality in the transition area. Bi-County addressed the sediment and pollutant issue by recognizing that "wetlands protect water quality by trapping sediments and retaining excess nutrients and other pollutants." Bi-County then stated that its plan preserves those wetlands by using "non-structural measures . . . such as grass swales and interrupted impervious surfaces, as well as structural features . . . including five maintained detention basins" to "reduce stormwater pollutants."

Bi-County also addressed the project's impact on T&E species, and listed the dominant species presently occurring in both the reduction and expansion areas. Bi-County also explained that its plan reduced impacts on sensitive species by preserving, in

addition to the compensation areas, four additional forested upland conservation areas that total 16.81 acres. Further, Bi-County acknowledged that while Barred Owls may not use the site for habitat purposes due to the relatively small size of the wetlands area, the site may function as a corridor for them.

Regarding water quality, Bi-County stated that Wayne will handle its wastewater, while Bi-County will protect riparian corridors and freshwater wetlands with an average 100-foot upland buffer around wetlands and stream corridors in which there are no major encroachments, and conserve four open spaces totaling over 16.81 acres of forested habitat. Bi-County also represented that it will preserve a portion of the isolated wetland to reduce surface water quality impacts.

Second, Bi-County explained it needed a transition area waiver to effectuate the proposed residential development because the transition area must be reduced to allow for the construction of single-family dwellings and an above-ground detention basin. Specifically, to build the dwellings and basin, Bi-County had to construct roadways, stormwater management facilities, and residential lots.

DEP's responses to the public's comments also demonstrate that DEP acted properly under N.J.S.A. 13:9B-18 and N.J.A.C. 7:7A-

6.1(d) in granting the transition area waiver.  DEP explained its decision as follows:

> Bi-County . . . applied for a [t]ransition [a]rea [w]aiver reduction . . . to reduce the 150 [foot] transition area adjacent to the exceptional resource value wetlands by 1.718 acres (74,874 sq. ft.).  The proposed transition area waiver reduction . . . would enable the construction of several single-family dwellings and a detention basin. To compensate for the transition area reduction, the wetland transition area will be expanded by 1.363 acres.  In addition, 16.81 acres of additional forested uplands that provide suitable [B]arred [O]wl habitat on the subject parcel will also be preserved.
>
> . . . .
>
> [DEP] holds the authority to protect freshwater wetlands and transition areas. . . . However, the rules allow wetlands and transition areas to be permanently impacted in certain circumstances.  Contrary to the commenter's claim, none of the proposed houses are located within freshwater wetlands, although some of the houses are located within the adjoining freshwater wetlands transition areas.  [Bi-County] has applied for a [t]ransition [a]rea [w]aiver [r]eduction pursuant to [N.J.A.C.] 7:7A-6.1(d).  As part of [Bi-County's] compliance with [N.J.A.C.] 7:7A-6.1(d), [Bi-County] proposes to permanently conserve 16.81 acres of forested areas on-site to offset the proposed encroachments into transition areas.
>
> [DEP] has reviewed the project for compliance with the standards at [N.J.A.C.] 7:7A-6.1(d).  The project does meet these standards and as such, [DEP] will issue a [t]ransition [a]rea [w]aiver in accordance with the [FWPA] rules.

31

Bi-County satisfied the requirements of <u>N.J.A.C.</u> 7:7A-6.1(d), and DEP complied with all regulatory requirements in issuing a transition area waiver. The record supports DEP's decision to issue a transition area waiver, and the decision is not arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION