**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1639-22

IN THE MATTER OF FLOOD
HAZARD AREA VERIFICATION
AND FLOOD HAZARD AREA
INDIVIDUAL PERMIT, 1113-22-
0002.1 LUP220002.

_____

Argued December 9, 2024 – Decided December 27, 2024

Before Judges Sabatino, Gummer and Berdote Byrne.

On appeal from the New Jersey Department of Environmental Protection, Permit Nos. 1113-22-0002.1 LUP220002.

Daniel A. Greenhouse and Kaitlin Morrison argued the cause for appellant The Watershed Institute (Eastern Environmental Law Center, attorneys; Daniel A. Greenhouse and Kaitlin Morrison, on the briefs).

Jordan Viana, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Matthew J. Platkin, Attorney General, attorney; Sara M. Gregory, Assistant Attorney General, of counsel; Jordan Viana, on the brief).

John G. Valeri, Jr., argued the cause for respondent Bridge Point West Windsor LLC (Chiesa Shahinian &

Giantomasi PC, attorneys; John G. Valeri, Jr., and Rafael Corbalan, on the brief).

PER CURIAM

Appellant The Watershed Institute ("TWI"), an environmental advocacy organization, challenges project approvals that respondent the Department of Environmental Protection (the "DEP") issued to co-respondent developer Bridge Point West Windsor, LLC ("Bridge Point"). The project involves the redevelopment of property in West Windsor, planned to be the site of a massive warehouse facility. The approvals on appeal involve two facets: a Flood Hazard Area Verification under N.J.A.C. 7:13-5 and a Flood Hazard Area Individual Permit under N.J.A.C. 7:13-10.

TWI asserts multiple arguments in contesting the DEP's final agency decisions. It argues the DEP: (1) failed to adequately ensure the project would be consistent with a local areawide Water Quality Management Plan ("WQMP"), in violation of the Water Quality Planning Act ("WQPA"), N.J.S.A. 58:11A-1 to -16; (2) erroneously permitted the construction of a culvert, rather than a bridge, at a proposed stream crossing, in violation of the Flood Hazard Area Control Act ("FHACA"), N.J.S.A. 58:16A-50 to -103, and the Flood Hazard Area Control Act Rules, N.J.A.C. 7:13-1 to -24; (3) failed to take into account new data predicting increased levels of precipitation in New Jersey, in

violation of the FHACA and other relevant law; and (4) failed to delineate floodways on the site, also in violation of the FHACA.

Respondents, the DEP and Bridge Point, oppose these contentions. Among other things, they argue that, except for the DEP's non-reliance upon new precipitation data, TWI waived these arguments by failing to raise them during the public comment period that preceded the permit approval. Respondents further assert that TWI's arguments have no substantive merit.

For the reasons that follow, we affirm most of the DEP's final agency decisions, with the exception of its approval of Bridge Point's plan to install a culvert at the stream crossing without a reasoned explanation that a bridge at that location would be infeasible. Because of that discrete shortcoming, we vacate the permit and verification, without prejudice to the outcome of a remand, and remand the matter to the DEP for further consideration of the issue on terms we explain in this opinion.

I.

The parties are all familiar with the factual and procedural background of this case, and we need not repeat it comprehensively here. The following summary will suffice for our purposes.

3

Development Background and Permit Application

In March 2022, Bridge Point submitted an application, prepared by Langan Engineering and Environmental Services, Inc. ("Langan") to the DEP for Flood Hazard Area Verification and a Flood Hazard Area Individual Permit.[1] It filed the application for its proposed redevelopment of what it called "Bridge Point 8 Industrial Park" in West Windsor Township. The project "consist[ed] of[, among other things,] the demolition of existing improvements onsite, . . . the construction of seven warehouses and accessory improvements[,] internal access roads, [and] stormwater management."

According to TWI, the project would be "the largest warehouse development in the State of New Jersey." The project would include 5.5 million square feet of building footprint coverage, 2,435 car parking spaces, and 1,072 truck-trailer parking spaces. The construction would disturb over 400 acres of property and cause an increase of over 241 acres of impervious coverage.

---

[1] The original multi-permit application was also for Freshwater Wetland General Permits and a Transition Area Averaging Plan Waiver. After the DEP advised that pending State Historic Preservation Office review—required for those approvals but not the flood hazard approvals—would likely not be finished in time to meet deadlines for the flood hazard approvals, Bridge Point bifurcated its application. The authorizations on appeal address the flood hazard approvals but not the wetlands permits, which, according to counsel, remained pending at the time of the appellate oral argument.

The 645-acre site is bounded to the north by U.S. Route 1 and abuts woodlands, farmlands, and a residential area. The northern portion contains buildings and structures formerly occupied by the American Cyanamid firm, which were vacated by 2004. The remaining site consists of woodlands and agricultural fields with various outbuildings.

In addition to a main watercourse known as Duck Pond Run, the site includes three unnamed tributaries to Duck Pond Run in the northern portion of the site and an unnamed tributary to Shipetaukin Creek in the southern portion. Duck Pond Run eventually discharges directly into the Delaware and Raritan Canal.

Flood Hazard Area Verification

In its application, Bridge Point requested Flood Hazard Area verification for each of the four on-site surface waters. Langan expected the riparian zones for all onsite waters to be fifty feet wide because "[n]o category one waters or trout maintenance/trout production waters [we]re located in the same HUC-14 watersheds as the site [and n]o threatened or endangered species that [we]re critically dependent on waters for survival [we]re located within one mile downstream of the site."

A-1639-22

Flood Hazard Area Individual Permit

The project also included "work within regulated waters and/or associated riparian zones and flood hazard areas" including "widening the existing public roadway Clarksville Road, grading work, . . . the construction of four stormwater outfalls,[2] a sanitary sewer line, a [new] access road to Route 1 and [new] internal access roads." According to the permit application, outfall construction around one of the unnamed Duck Pond Run tributaries and one of the unnamed Shipetauken Creek tributaries was "necessary . . . to manage stormwater onsite, in compliance with the Stormwater Management Rules[, N.J.A.C. 7:8-5.1 to -5.9]." Construction of a new access road crossing one of the unnamed Duck Pond Run tributaries would "include installation of a 24-inch culvert" and was allegedly "necessary for safe ingress/egress" to and from Route 1. The Clarksville Road widening would "provide safe and consistent vehicular, pedestrian and bicycle mobility infrastructure." The proposed access road and Clarksville Road widening would, however, exceed maximum allowable disturbance designations.

---

[2] Three of the four stormwater proposed outfalls were located within riparian zones.

A-1639-22

In its original application, Bridge Point assured compliance with the FHACA rules. "The nature of stormwater outfalls" meant disturbance to the nearby tributaries was inevitable, but Bridge Point promised to "minimize[disturbances] to the extent practicable." In its application, Bridge Point asserted that "all areas of encroachment w[ere to] be finished at or below the pre-existing grade to avoid creating an impediment to surface water flow" and construction of the stormwater outfalls was to "occur outside from the channel[s] such that no additional or temporary impact w[ould] occur beyond what [wa]s necessary."

The Route 1 access road would cross one of the unnamed Duck Pond Run tributaries perpendicularly and at a narrow point to reduce disturbance. The culvert created for that crossing was "based on the width and character" of the tributary, which "appear[ed] to be a historically man-made drainage ditch" containing "a bed of less than 5 feet wide . . . dominated by dense vegetation that offers little or no value to aquatic species."

The application also included assurances of compliance with FHACA rules for regulated activity within riparian zones. Bridge Point listed the aforementioned "work within channels of regulated waters," along with construction of two internal access roads, as work "within riparian zones." In

7

the application, Bridge Point asserted generally that "[r]iparian zone disturbance ha[d] been reduced to the maximum extent practicable" for each activity. Regarding the culvert, Bridge Point claimed "[d]ue to the prevalence of surface waters throughout the northern portion of the site, there [we]re no other opportunities onsite that [would] avoid[] a stream crossing."

The Cornell Studies and the Anticipated Inland Flood Protection Rule

At the same time Bridge Point's application was pending, studies were released that predicted higher rainfall levels in New Jersey beyond earlier estimates. Specifically, on November 18, 2021, the DEP released two studies (the "Cornell Studies") authored by Dr. Arthur DeGaetano, director of the Northeast Regional Climate Center—a National Oceanic and Atmospheric Administration ("NOAA") partner—and Professor of Earth and Atmospheric Sciences at Cornell University. Those studies, which the DEP peer-reviewed, showed that precipitation amounts in New Jersey are "2.5% to 10% higher" than in 1999 and are "likely to increase by more than 20% from th[at] 1999 baseline by 2100." The studies also described that the "projected [precipitation] changes will be greater in the northern part of the state than in the southern and coastal areas."

8

On May 27, 2022, Senior Project Scientist Robert March of Langan emailed DEP Environmental Specialist Ariana Tsiattalos to schedule further discussion on "information needed to get th[e] application deemed administratively complete" in light of "the anticipated [DEP] Emergency Rule[,]" the Inland Flood Protection Rule ("IFPR"). The IFPR was proposed on December 5, 2022, 54 N.J.R. 2169(a), and made effective July 17, 2023, 55 N.J.R. 1385(b). The IFPR amended the Stormwater Management Rules and FHACA rules "to account for current and future increased precipitation conditions in New Jersey." 55 N.J.R. 1385(b). The IFPR incorporated the findings from the Cornell Studies. Ibid.; see also 54 N.J.R. 2169(a).

In an email Tsiattalos sent to March in June 2022 after a call with him, she advised him that "FHA-Verifications cannot be grandfathered under the old rule and will be subject to the emergency rule."

Deficiency Letters, Further Communications, and Comments

The DEP sent Bridge Point multiple deficiency letters between April 2022 and November 2022. In those letters, the DEP demanded additional information and justification to enable its review of the project. The letters addressed several issues raised on this appeal, including the flood hazard area assessment and

9

floodway delineation, proposed culvert construction and its impact in riparian zones, and water quality assessments.

In a series of response letters between June 2022 and November 2022, Bridge Point provided the documentation and justification that the DEP had requested and modified several aspects of its project plans. Among other things, Bridge Point modified its Clarksville Road improvement plans and relocated a stream crossing. Those modifications avoided direct impacts to the adjacent drainage ditch and reduced the proposed disturbance of the riparian zone vegetation opposite the ditch from 37,287 square feet to approximately 8,133 square feet.

Bridge Point further assured the DEP that the proposed Route 1 access road "ha[d] been revised to avoid" wetlands and "[a] retaining wall ha[d] . . . been added to reduce . . . disturbance." It revised the access road plans so that the road crossed the unnamed Duck Pond Run tributary at a perpendicular angle to reduce disturbance.

In a letter to the DEP in July 2022, TWI expressed general concern regarding flooding and stormwater management on the site. Without directly citing the Cornell Studies, the letter referenced the same predicted precipitation increases listed in the studies and warned of the "[e]mergency rule[] . . .

currently being considered by the . . . DEP that would raise design flood elevations by two feet."

In August 2022, Bridge Point's permit application was deemed administratively complete. Then, in September 2022, the DEP conferred with TWI in a remote meeting and heard TWI's concerns regarding the project.

The timing of the DEP review process is significant. Under the FHACA, if the DEP fails to act on a construction permit application within ninety days, that application "shall be deemed to have been approved." N.J.S.A. 13:1D-32. This period may be extended at the mutual consent of the applicant and the DEP by thirty days. N.J.S.A. 13:1D-31. On October 14, 2022, at Bridge Point's request, the DEP extended the permit application deadline by thirty days to December 1, 2022.

A few days later, TWI sent the DEP an email expressing concerns regarding the project's stormwater Best Management Plans ("BMPs") and flooding. In that letter, TWI cited the Cornell Studies and the forthcoming IFPR.

On November 30, 2022, a representative of the DEP sent an email to March stating: "Unfortunately I just noticed that you have a floodway line on your Riparian Zone plans. Since we are not verifying any floodways, this line cannot be on there to be approvable. Is it possible for you to remove the

floodway line from the applicable plans?" Later that day, a Langan senior project manager sent an email to the DEP indicating Langan had removed the floodway from its FHA and Riparian Zone plans and uploaded a revised version.

In a letter dated December 1, TWI expressed concerns about the effects the project's planned stormwater BMPs may have on nearby wetlands, incorrect flood hazard data, and parts of the proposed site development that would exceed maximum allowable disturbances.

Additional Reports

With the December 1 extended deadline looming, Langan prepared a Stormwater Management Report for the project and submitted it on November 22, 2022. The report assured the project would comply with the Stormwater Management Rules, described stormwater analyses Langan had reviewed or conducted, and detailed stormwater management and flood mitigation measures including "constructed wetlands, bioretention basins, porous pavement, underground infiltration systems, and landscaped areas."

A day before the December 1 deadline, the DEP issued an Engineering Report concerning the site. That report acknowledged that "several public comments [had been] received concerning flooding," including "an objection . . . that the flooding data is from 1999," but "the applicant . . . used

this data to perform independent analyses to determine the flood hazard area elevation" and "properly addressed [flooding] concerns."  According to the report, the project satisfied the requirements of the WQPA, FHACA, and Stormwater Management Rules.  The report assured that "[n]o activities w[ould] take place in any floodway" and "the floodway was not delineated for any of the watercourses on site because by inspection, it [wa]s clear that the floodway w[ould] not be impacted by the . . . [one] stormwater outfall structure proposed in the flood hazard area."

The DEP issued a separate Environmental Report on December 1.  The report included a WQMP rules consistency assessment, which concluded that "[a]ll proposed activities [we]re located within the limits of the mapped sewer service area . . . [t]herefore, the project [wa]s consistent with the [WQMP] adopted under the [WQPA]."  Regarding the widening of the Clarksville Road and the new Route 1 access road, the report declared "[a]ll impacts ha[d] been minimized to the greatest extent possible."

The Issuance of the Individual Permit and the Flood Hazard Verification

On December 1, 2022—the last day of the extended deadline—the DEP issued to Bridge Point its approvals of the Flood Hazard Area Verification and Flood Hazard Area Individual Permit for the project.  The permit instructed

Bridge Point to obtain the bifurcated freshwater wetlands permits "prior to the start of any activity authorized by this permit." The approvals constitute the DEP's final agency decisions for purposes of appellate review. R. 2:2-3(a)(2).

## II.

This appeal by TWI followed, asserting the issues we identified in our introduction. In assessing those issues, we are guided by familiar principles that govern the scope of appellate review of decisions by State agencies.

"The scope of review of an administrative agency determination is limited." Del. Riverkeeper Network v. N.J. Dep't of Env't Prot., 463 N.J. Super. 96, 112 (App. Div. 2020). On appeal, we "will not reverse the agency's decision unless: (1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record." N.J. Highlands Coal. v. N.J. Dep't of Env't Prot., 456 N.J. Super. 590, 602–03 (App. Div. 2017), aff'd as modified, 236 N.J. 208 (2018).

"The party who challenges [the] DEP's decision to permit development of a certain location has the 'burden of demonstrating, not that the agencies' action was merely erroneous, but that it was arbitrary.'" Id. at 603 (quoting In re Stream

14

Encroachment Permit No. 0200-04-0002.1 FHA, 402 N.J. Super. 587, 597 (App. Div. 2008)). We accord "traditional deference to an agency's specialized expertise[, which] is even stronger when the agency, like [the] DEP in regard to wetlands, has been delegated discretion to determine the specialized and technical procedures for its tasks." In re Thomas Orban/Square Props., LLC, 461 N.J. Super. 57, 72 (App. Div. 2019) (internal citations and quotation marks omitted).

"Importantly, however, '[w]hile [courts] must defer to the agency's expertise, [they] need not surrender to it.'" Ibid. (quoting N.J. Chapter of Nat'l Ass'n of Indus. & Office Parks v. N.J. Dep't of Env't Prot., 241 N.J. Super. 145, 165 (App. Div. 1990)).

Also, we extend "substantial deference to an agency's interpretation of its own regulations, reasoning that 'the agency that drafted and promulgated the rule should know the meaning of that rule.'" Ibid. (quoting In re Freshwater Wetlands Gen. Permit No. 16, 379 N.J. Super. 331, 341–42 (App. Div. 2005)). "[B]ecause a permitting decision by the [DEP] is a quasi-judicial determination," though, "reasoned fact-finding is essential." Ibid.

Our review of legal issues, meanwhile, is de novo. "Agencies . . . have no superior ability to resolve purely legal questions, and . . . a court is not bound

by an agency's determination of a legal issue . . . ." Stream Encroachment Permit, 402 N.J. Super. at 597 (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

Furthermore, the "DEP's permitting process is 'best classified as a quasi-judicial procedure possessing some, but not all, of the elements of a traditional adjudicatory proceeding.'" Musconetcong Watershed Ass'n v. N.J. Dep't of Env't Prot., 476 N.J. Super. 465, 487–88 (App. Div. 2023) (quoting In re Issuance of a Permit by Dep't of Env't Prot. to Ciba-Geigy Corp., 120 N.J. 164, 172 (1990)). The process "must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for the . . . purpose of informing the . . . parties and any reviewing tribunal . . . so that it may be readily determined whether the result is sufficiently and soundly grounded." Id. at 488 (quoting In re Application for Med. Marijuana Alt. Treatment Ctr. for Pangaea Health & Wellness, LLC, 465 N.J. Super. 343, 375 (App. Div. 2020)). We apply these principles of review to the appeal before us.

### III.

The primary issue raised by appellant that warrants our most extensive discussion concerns whether Bridge Point had an obligation to demonstrate to

16

the DEP that, in compliance with N.J.A.C. 7:13-11.1(c)(2)(ii), it was not "feasible" to construct a bridge, rather than a culvert, to modify the channel at the tributary location in question, and, if so, whether it fulfilled that obligation.

The full text of N.J.A.C. 7:13-11.1(c), which contains this feasibility provision and in which other feasibility language appears, is as follows:

> (c) The [DEP] shall issue an individual permit for a channel modification only if the applicant demonstrates that, in addition to meeting the requirements of (b) above, the channel modification meets at least one of the following requirements:
>
> > 1. The channel modification is necessary to improve the ecological health of the regulated water and its riparian zone, or to control existing flooding or erosion which poses an immediate threat to life, property or a lawfully existing structure; or
> >
> > 2. The channel modification is necessary for the construction of a bridge or culvert, and the following requirements are satisfied:
> >
> > > i. The disturbance to the channel is the minimum necessary to successfully implement the project;
> > >
> > > ii. A bridge is constructed rather than a culvert, where feasible;
> > >
> > > iii. The length of channel covered by a bridge or enclosed in a culvert is the minimum feasible; and

iv. No more than 200 linear feet of channel (including the bridge or culvert) is disturbed <u>unless the applicant demonstrates that disturbance to a longer segment of channel cannot feasibly be avoided</u>.

[(Emphasis added).]

The genesis of this regulatory language is instructive. The DEP proposed the regulation in October 2006 as part of a comprehensive overhaul of the flood hazard provisions. 38 N.J.R. 3950(a) (Oct. 2, 2006) (rule proposal). Among other things, the DEP explained in its proposal (then numbered as "N.J.A.C. 7:13-10.1(c)2"), as follows:

Proposed N.J.A.C. 7:13-10.1(c)2 allows up to 200 feet of channel modification <u>if necessary for the construction of a bridge or culvert, provided channel disturbance is minimized, a bridge is constructed rather than a culvert, where feasible, and the length of channel enclosed by the structure is the minimum feasible</u>. The construction of a bridge or culvert often requires some amount of channel modification. The existing rules at N.J.A.C. 7:13-2.16(b)4 encourage minimizing the length of a channel modification, but set no specific length limit. It has been [the DEP's] experience that the construction of a bridge or culvert rarely justifies a channel modification of greater than 200 feet. Therefore, the proposed provision requires that the length of disturbed channel be minimized and requires that disturbance be limited to no greater than 200 feet. If a particular bridge or culvert proposed for construction requires a greater amount of channel disturbance, the project should be redesigned using a

larger span or culvert size to reduce the length of transition in the channel.

[38 N.J.R. 3952(a), at 3993 (emphasis added).]

The DEP therefore included the "where feasible" language within the text of the proposed new provision.  Id. at 4075.

During the public comment period, some commenters raised concerns about whether the provision was too onerous in various respects.  Nevertheless, the DEP declined to revise it and make it easier for applicants to justify the use of a culvert instead of a bridge.  In its final adoption of the rule in November 2007, the DEP explained in detail why the rule favored bridges instead of culverts:

> RESPONSE TO COMMENTS 730 AND 731: N.J.A.C. 7:13-10.1(c)2 provides that if channel modification is necessary for the construction of a bridge or culvert, the following requirements must be satisfied:  the disturbance to the channel is minimized; a bridge is constructed rather than a culvert, where feasible; the length of the channel covered by a bridge or enclosed by a culvert is the minimum feasible; and no more than 200 linear feet of channel (including the bridge or culvert) is disturbed.
>
> It is the [DEP's] experience that applicants often do not design projects with the minimum amount of disturbance to the stream channel.  The adopted provisions, therefore, encourage bridges rather than culverts.  Bridges usually span a channel and thus typically involve much less disturbance to a channel

than the placement of a culvert. Additionally, bridges often require less permanent stabilization within the channel or surrounding riparian zone. The [DEP] believes limiting channel modifications for bridges and culverts to 200 linear feet will further the [DEP's] goal of limiting channel disturbance, since long reaches of such disturbance often result in adverse impacts to the ecological health of the channel.

The [DEP] believes that most bridge and culvert projects should be able to satisfy the limit without conflicting with the intent of the project or jeopardizing public safety. However, the [DEP] does acknowledge that some projects, such as large highway bridges, may require more than 200 linear feet of channel disturbance to construct. In such cases, applicants for these projects would be required to submit a request for a hardship exception under N.J.A.C. 7:13-9.8 with their individual permit application. The [DEP] believes that these situations are likely to be rare, however. Furthermore, if there is a clear need to exceed the limit to accommodate transportation and safety needs, which cannot be accomplished by other reasonable means, the applicant should be able to demonstrate that a hardship exception is warranted. Therefore, the [DEP] believes that it is appropriate to adopt a 200-linear-foot limitation for channel modifications under N.J.A.C. 7:13-10.1(c)2iv.

[39 N.J.R. 4373(a), at 4677 (Nov. 5, 2007) (rule adoption) (emphasis added).]

The regulation was relocated to N.J.A.C. 7:13-11.1(c)(2) when the flood hazard rules were recodified in 2016, with no change in the above provision. 48 N.J.R. 1067(a), at 1242 (June 20, 2016) (rule adoption).

A-1639-22

The regulation does not define the word "feasible." We consult the common meaning of the term, informed by the DEP's above-quoted explanation of its policy reasons underlying the rule. Merriam-Webster's defines feasible: as: (1) "capable of being done or carried out"; (2) "capable of being used or dealt with successfully, SUITABLE"; and (3) "REASONABLE, LIKELY". Merriam-Webster's Collegiate Dictionary 458 (11th ed. 2020). These dictionary definitions comport with conventional notions of "feasible." They connote what can be done, as contrasted with what one might prefer to be done.

As was confirmed at oral argument on the appeal, the parties all agree that Bridge Point, as the applicant for the individual permit, had the burden to demonstrate that a bridge was infeasible at the subject location, rather than the DEP or objectors having the burden to show that a bridge was feasible. That burden allocation is consistent with N.J.A.C. 7:13-18.2, -18.4, -18.7, and -18.8, which require applicants to establish in their submissions all requirements for obtaining a permit.

The expert report that Bridge Point submitted to the DEP did not explicitly address the infeasibility of a bridge at the subject location. Instead, the report simply stated, in conclusory fashion, that "construction of a culvert is a more

practical application at this location." No explanation of this conclusion was supplied. This falls short of the applicant's burden to demonstrate infeasibility.

The most pertinent definition of "practical" from <u>Merriam-Webster's</u> is "capable of being put to use or account: useful." <u>Merriam-Webster's Collegiate Dictionary</u> 974 (11th ed. 2020). The term practical may have been intended by the applicant's expert as a synonym for "feasible." But declaring that a culvert was the "more practical" alternative for the waterway crossing does not mean that a bridge at that spot was not "feasible." The history of the regulation we have cited above—which generically favors bridges over culverts—instructs that it requires the applicant to demonstrate that a bridge is, on its own terms, not feasible. A bridge hypothetically could be feasible or practical, but regarded by the applicant as an inferior option. The regulation mandates, however, that a bridge must be used unless proven to not be feasible at all.

Conceptually, it is possible that several options can be "feasible," even if one of those options is regarded as "more practical" than others. Neither Bridge Point nor the DEP may not rewrite the regulation to substitute the term "more practical" for "feasible." The only mention of feasibility within Bridge Point's application is the following passage: "Due to the prevalence of regulated waters throughout the northern portion of the site, no other feasible opportunities for

22

access to Route 1 exist that would avoid crossing a stream." This passage concerns the feasibility of the access location. It does not address the feasibility or infeasibility of a bridge to cross at that recommended location. The regulation's history, which we quoted from above, makes it clear the intent of these provisions is to favor bridges, which tend in the DEP's experience to produce less adverse environmental impacts than culverts.

The DEP's final agency decisions do not explain why it deemed Bridge Point's application as satisfying the infeasibility requirement of N.J.A.C. 7:13-11(c)(2)(ii). The brief filed by the Attorney General on behalf of the DEP hypothesizes why a bridge would not be feasible at the location. But those assertions in a brief do not cure the agency's omission. "An agency must engage in fact-finding to the extent required by statute or regulation . . . [which] is a matter of substance . . . [and] ensures that agencies act within the scope of their delegated authority and also facilitates appellate review." Ciba-Geigy Corp., 120 N.J. at 173 (internal citations and quotations omitted). "We cannot give deference to an agency's factfinding unless we have 'confidence that there has been a careful consideration of the facts in issue and appropriate findings addressing the critical issues in dispute.'" In re Orban, 461 N.J. Super. at 77 (quoting Bailey v. Bd. of Rev., 339 N.J. Super. 29, 33 (App. Div. 2001)). Simply

23

stated, "[a]n appellate brief is no place for an agency to try and rehabilitate its actions." In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, 139 (App. Div. 2013).

We are unpersuaded by respondents' claim that separate provisions within N.J.A.C.7:13-12.7 addressing various requirements for bridges and culverts eliminate an applicant's obligation under N.J.A.C. 7:13-11(c)(2)(ii) to establish that a bridge at a waterway crossing is not feasible. The subsection 12.7 provisions come into play for culverts only after first determining whether a culvert is justified at all. We are obligated to give meaning to all of a code's provisions. See State v. Harper, 229 N.J. 228, 237–38 (2017); see also Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012). Respondents' arguments concerning subsection 12.7 would improperly render the feasibility requirement separately imposed by N.J.A.C. 7:13-11.1(c)(2)(ii) superfluous.

Properly construed, the regulatory scheme requires that applicants for an individual FHACA permit satisfy both N.J.A.C. 7:13-11.1, which regulates area-specific requirements for individual permits, such as channels requiring modification, and N.J.A.C. 7:13-12.7, which governs activity-specific requirements for individual permits, such as the construction of bridges and culverts. Although separate, those regulations must be read and applied together

24

insofar as they control different aspects of a proposed development. At the time

Bridge Point submitted its application to the DEP, N.J.A.C. 7:13-10.1 read:

> (a) A person shall obtain an individual permit under this subchapter in order to undertake any activity that does not meet the requirements of a permit-by-rule pursuant to N.J.A.C. 7:13-7, an authorization under a general permit-by-certification pursuant to N.J.A.C. 7:13-8, an authorization under a general permit pursuant to N.J.A.C. 7:13-9, or a coastal permit under the circumstances set forth at N.J.A.C. 7:13-2.1(b)6.
>
> (b) A regulated activity or project subject to an individual permit shall meet:
>
>> 1. The applicable area-specific requirements at N.J.A.C. 7:13-11; and
>>
>> 2. The applicable activity-specific requirements at N.J.A.C. 7:13-12.
>
> [48 N.J.R. 1067(a), at 1241 (June 20, 2016) (rule adoption) (emphasis added).]

That regulation, N.J.A.C. 7:13-10.1, was amended in 2023 to add an extra

requirement, now in (b)(3), for applicable design and construction standards. 55

N.J.R. 1385(b), at 1464 (July 17, 2023) (rule adoption).

We reject respondents' contention that the 2016 amendments to N.J.A.C.

7:13-12.7(g) repealed an applicant's obligation under N.J.A.C. 7:13-11.1(c)(2)

to demonstrate that a bridge is infeasible, or relieved the DEP of making a

feasibility determination. Subsection 12.7(g) illustrates various reasons why a

25

A-1639-22

bridge might be infeasible.  Notably, the 2016 revision reiterates the DEP's overall preference for spanning the channel with a bridge or other three-sided structure "because it preserves the natural channel with minimal disturbance." See N.J.A.C. 7:13-12.7(g); 47 N.J.R. 1041, at 1096.  The 2015 rule proposal for revising subsection 12.7(g) acknowledges that in some situations "the width of the stream [may be] so small that the natural channel must be fully disturbed during construction to create the footings necessary to span the regulated water [such that] spanning a channel with a bridge, arch culvert, or three-sided culvert does not provide a significant environmental benefit over constructing a circular, elliptical or box culvert that, where possible, incorporates a natural substrate within the bottom of the structure."  Ibid.  Even so, Bridge Point's application did not say this, nor did the DEP's final agency decisions.  And, as we noted above, after receiving comments about the proposed amendment, the DEP chose to mandate compliance with both the separate requirements of N.J.A.C. 7:13-11.1 concerning "area-specific" conditions and N.J.A.C. 7:13-12-7 concerning "activity-specific" conditions.  See 48 N.J.R. 1067, at 1241  (June 20, 2016) (rule adoption).

We accordingly reject the assertion that projects meeting the criteria for culverts under N.J.A.C. 7:13-12.7 inherently or automatically qualify under the

feasibility analysis mandated by N.J.A.C. 7:13-11.1(c)(2)(ii). They are two distinct requirements.

"An agency cannot issue a permit absent satisfaction of the applicable statutory and regulatory criteria." Ciba-Geigy Corp., 120 N.J. at 180; see In re Authorization for Freshwater Wetlands Gen. Permits, 372 N.J. Super. 578, 596 n.8 (App. Div. 2004); see also Del. Riverkeeper Network, 463 N.J. Super. at 113. Given that well-established principle, we reject respondents' contention that appellant waived its right to appeal the DEP's issuance of the permit because it did not present objections to the agency about the bridge feasibility issue before the permit was approved. We recognize TWI commented on other facets of the project during the permit review process, but it was not certain that the DEP would approve of the applicant's decision to forego a bridge until the permit was issued on December 1, 2022. To be sure, it would have been preferable for TWI to have voiced this concern sooner, but TWI did not relinquish its right, as a matter of law, to appeal the final agency decisions once they were made.

We are also cognizant that, as Bridge Point emphasizes, the tributary in question does not, at present, apparently contain fish or continuous waterflow. But that overlooks the flood hazard preventative function and potential environmental impacts involved. If heavy precipitation produces a high amount

27

of stormwater runoff, the drainage system must be prepared to accommodate it and avoid flooding. We take judicial notice in this regard of the proximity to the site of U.S. Route 1 and the surrounding businesses, dwellings, and ecosystems that could be damaged by local flooding. See 39 N.J.R. 4373(a), at 4677 (Nov. 5, 2007) (rule adoption).

To conclude, in light of this material omission in Bridge Point's application and in the DEP's final agency decisions, we must vacate the individual permit and verification, without prejudice to the outcome of a remand, to enable the agency to reconsider an amplified application by Bridge Point that explicitly addresses the bridge infeasibility requirement of N.J.A.C. 7:13-11(c)(2)(ii). In the meantime, no activity on the site that requires such a permit and verification shall proceed.

## IV.

The remaining issues raised by appellant lack merit. We briefly discuss them here.

## A.

First, we are satisfied the DEP properly conducted its WQMP consistency assessment under the WQPA. The plain language of the WQMP provision creates a rebuttable presumption that projects within sewer areas comply with

areawide plans. N.J.A.C. 7:15-3.2(b). This project, which is located within a sewer area, qualifies. The WQMP rules impose additional requirements, along with areawide plan consistency assessments, but the DEP had satisfied those ahead of its approval of the project. TWI is required to, but did not, effectively rebut the presumption that the project complies with the areawide plan. The DEP's handling of this subject was neither arbitrary nor capricious.

B.

Second, the DEP properly carried out its flood hazard area delineation responsibility, despite the additional rainfall projections that were cited in the Cornell Studies. The new precipitation data had not yet been incorporated into the IFPR at the time the DEP issued the permit to Bridge Point on December 1, 2022. See N.J.S.A. 58:16A-52(a) (establishing a process for the DEP in delineating flood hazard areas every fifteen years).

We agree with respondents that the DEP would not be in compliance with the Administrative Procedure Act ("APA"), N.J.S.A. 52:14B-1 to -31, if it prematurely began enforcing the new precipitation levels in the IFPR without an appropriate rulemaking and notice-and-comment period. See Metromedia, Inc. v. Dir., Div. of Tax'n, 97 N.J. 313, 328 (1984); In re Authorization For Freshwater Wetlands Statewide Gen. Permit 6, Special Activity Transition Area

Waiver For Stormwater Mgmt., Water Quality Certification, 433 N.J. Super. 385, 414 (App. Div. 2013) (applying the Metromedia standards for when agency rulemaking is necessary). We further note the DEP's assertion that aspects of the Cornell Studies that were eventually incorporated into the IFPR "provide[d] only the adjustment factors for storms for certain specific weather stations" and did "not include the raw precipitation data from 1950 to 2019 that was used to develop the adjustment and change factors."

Although the Cornell Studies indicated that precipitation levels in New Jersey had been and would likely continue to rise at significant rates, implementing regulatory changes based on them would require formal rulemaking. Indeed, the DEP now applies the findings of those studies, articulated further through the IFPR, to all new flood hazard area verifications. Although the Cornell Studies existed before the DEP approved Bridge Point's permit on December 1, 2022, the IFPR—which made them legally effective— was not proposed until four days later on December 5, 2022. 54 N.J.R. 2169(a). The sweeping changes of the rule, intended to apply proactively, required formal rulemaking. The DEP properly approved the permit in this case without incorporating the yet-to-be-applicable Cornell Studies' findings.

We also decline TWI's urging that we read the definition of "flood hazard area design flood" within N.J.A.C. 7:13-1.2 to require the DEP to have taken into account the Cornell Studies rainfall data when it approved the permit on December 1, 2022. The cited definition refers to a flood that equals the 100-year flood level, plus "possible future increases in flows." That definitional language cannot override the APA statute and the Metromedia doctrine. A regulation cannot nullify a contrary statute and case law.

## C.

Lastly, we reject TWI's contention that the DEP erroneously decided not to delineate floodways on the site. The argument fails because an exception relieves the DEP from making such a floodway designation.

"The inner portion of the flood hazard area is called the floodway." N.J.A.C. 7:13-1.2. The FHACA's rules generally require a floodway verification before, or contemporary with, an authorization of an individual permit. N.J.A.C. 7:13-5.2(b); N.J.A.C. 7:13-5.5. This requirement is subject, however, to two exceptions in N.J.A.C. 7:13-5.5(a).

Relevant here, no floodway verification is required under N.J.A.C. 7:13-5.5(c)(1)-(2) if the DEP

31

determines, based on a visual inspection of submitted site plans and without review of calculations, that the following requirements are satisfied:

> 1. No fill or aboveground structure is proposed within a floodway; and

> 2. Compliance with the flood storage displacement requirements of N.J.A.C. 7:13-11.4 does not require knowledge of the floodway.

According to Bridge Point's permit application and the DEP's permit approval, no fill or aboveground structure was proposed within a floodway on the site. The only work proposed within a floodway would be the widening of Clarksville Road, and "proposed conditions w[ould] generally be constructed at grade to avoid the placement of fill in the floodway." Based on a site inspection, the DEP concluded that the one stormwater outfall Bridge Point had proposed constructing in a flood hazard area would not impact a floodway. The DEP also determined, without delineating the floodway but after reviewing flood storage calculations, that the project complied with the flood storage displacement requirements of N.J.A.C. 7:13-11.4.

Hence, the DEP satisfied both criteria for the exception under N.J.A.C. 7:13-5.5(c).

D.

To the extent we have not discussed them expressly, all of TWI's remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

V.

In sum, we affirm the DEP's final agency decision as to all issues raised on appeal, with the exception of the insufficiency of the DEP's findings concerning the bridge infeasibility requirement of N.J.A.C. 7:11.1(c)(2)(ii). As noted above, we vacate the individual permit and verification, without prejudice to the outcome of a remand, and remand the subject to the DEP for expeditious further consideration of the matter. The DEP will have the discretion (1) to require a new complete permit application, or (2) to request an amplified or clarified submission from Bridge Point on the feasibility topic and, if so, the agency shall provide TWI and any other interested parties a fair opportunity to comment. We do not require a new complete permit application to be submitted, and the DEP may continue to deem the application, subject to its potential cure, as preceding the July 17, 2023 applicability of the IFPR rainfall guidelines. N.J.A.C. 7:8-1.6; N.J.A.C. 7:13-21.1(e).

A-1639-22

We stay our opinion, sua sponte, for twenty days to enable any of the parties to pursue emergent Supreme Court review; if an application is filed with the Court within that twenty-day period, the interim stay will remain in effect subject to the Court's direction.

Affirmed in part and vacated in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1639-22