576 A.2d 784

IN THE MATTER OF THE ISSUANCE OF A PERMIT BY THE DEPARTMENT OF ENVIRONMENTAL PROTECTION TO CIBA–GEIGY CORPORATION.

IN THE MATTER OF NEW JERSEY POLLUTANT DISCHARGE ELIMINATION SYSTEM PERMIT ISSUED TO CIBA–GEIGY CORPORATION UNDER DATE OF MAY 8, 1985, EFFECTIVE JULY 1, 1985, PERMIT NO. NJ–0004120.

BOROUGH OF LAVALLETTE, BOROUGH OF SEASIDE PARK, OCEAN COUNTY CITIZENS FOR CLEAN WATER, SENATOR JOHN F. RUSSO, ASSEMBLYMAN JOHN PAUL DOYLE, FOR-MER ASSEMBLYWOMAN MARLENE LYNCH FORD, WIL-LIAM SKOWRONSKI, STEPHANIE WAUTERS, STEVEN A. MOLELLO, CHRISTINA MIICK, CHARLES KISSELMAN, MOE ALPERT, G. STANDFORD RAYMOND, NANCY McGREEVY, AND FRANK MASSERA, APPELLANTS, v. NEW JERSEY DE-PARTMENT OF ENVIRONMENTAL PROTECTION AND CIBA-GEIGY CORPORATION, RESPONDENTS.

Argued February 14, 1990—Decided July 16, 1990.

*Edward Lloyd* argued the cause for appellants Borough of Lavallette, *et al.* (*Edward Lloyd* and *Margaret Hayden*, attorneys for Ocean County Citizens for Clean Water, *et al.*, *Steven A. Pardes*, attorney for Borough of Lavallette and *Terry F. Brady*, attorney for Borough of Seaside).

*Donald L. Morgan*, a member of the District of Columbia bar, argued the cause for respondent Ciba–Geigy Corporation (*Lowenstein, Sandler, Kohl, Fisher & Boylan*, attorneys; *Michael L. Rodburg*, of counsel; *Donald L. Morgan* and *Michael L. Rodburg*, on the briefs).

*Paul Schneider*, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (*Robert J. Del Tufo*, Attorney General of New Jersey, attorney; *Mary C. Jacobson*, Deputy Attorney General, of

counsel; *Barbara A. Pryor,* Special Deputy Attorney General, on the brief).

*Richard E. Shapiro,* Director, Division of Public Interest Advocacy, argued the cause for *amicus curiae* Public Advocate of New Jersey (*Thomas S. Smith, Jr.,* Acting Public Advocate, attorney; *Susan Remis Silver,* Assistant Deputy Public Advocate, on the brief).

*James R. Zazzali* submitted a brief on behalf of *amici curiae* Natural Resources Defense Council, Inc., and The Oceanic Society (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

This case primarily concerns the validity of the administrative procedures followed by the New Jersey Department of Environmental Protection (DEP) in issuing a permit that authorized Ciba–Geigy Corporation (Ciba–Geigy) to discharge an average of 5.9 million gallons per day of chemically-treated effluent into the Atlantic Ocean. On appeal, petitioners challenged the permit on several grounds, including whether DEP had made findings on the record to satisfy statutory criteria that are prerequisites to the issuance of a permit. In an unreported opinion, the Appellate Division sustained the permit, holding that the agency's actions were not arbitrary or capricious. We granted certification. 115 *N.J.* 69, 556 *A.*2d 1214 (1989). During argument before this Court, the parties acknowledged that the issues raised before the Appellate Division are essentially moot because the permit was to expire on June 30, 1990. Nonetheless, we consider and decide the procedural challenges addressed to the issuance of the permit in view of their significance and the likelihood that the issues presented will recur. *In re Geraghty,* 68 *N.J.* 209, 212, 343 *A.*2d 737 (1975).

## I.

The Federal Water Pollution Control Act Amendments of 1972 (the Clean Water Act), 33 *U.S.C.* §§ 1251 to 1387 (1978),

prohibit the discharge of any pollutant into the nation's waters without a permit. 33 *U.S.C.* §§ 1311(a), 1342. In September 1974, the Environmental Protection Agency (EPA) issued a National Pollutant Discharge Elimination System (NPDES) permit to the Toms River Chemical Corporation, which allowed the company to discharge effluent into the Atlantic Ocean, approximately 3,500 feet offshore.

Respondent Ciba–Geigy (Ciba–Geigy) purchased a controlling interest in the Toms River Chemical Corporation before the permit expired. In June 1981, Ciba–Geigy applied to the EPA for a renewal permit for its Toms River plant.

In April 1982 the EPA approved New Jersey's request to permit DEP to administer the federal NPDES program in this State. See 33 *U.S.C.* § 1342(b); *EPA v. State Water Resources Control Bd.*, 426 *U.S.* 200, 96 *S.Ct.* 2022, 48 *L.Ed.*2d 578 (1976). New Jersey administers its program under the New Jersey Water Pollution Control Act ("the State Act"). *L.*1977, *c.* 74, § 2 (codified at *N.J.S.A.* 58:10A–1 to –43). Like its federal counterpart, the State Act prohibits the discharge of pollutants into any state waters without a New Jersey Pollutant Discharge Elimination System (NJPDES) permit. *N.J.S.A.* 58:10A–6a.

By the time New Jersey had obtained EPA approval to administer its own program, the data in support of Ciba–Geigy's application had become outdated. In July 1984, Ciba–Geigy submitted a revised application for a NJPDES permit. DEP issued a draft permit to Ciba–Geigy in September 1984 and invited public comment. Hundreds of local residents attended a public hearing in October 1984.

In May 1985 DEP issued a final permit to Ciba–Geigy, effective July 1, 1985. The permit had a five-year duration and allowed Ciba–Geigy to discharge an average of 5.9 million gallons of treated effluent per day from the Toms River facility into the Atlantic Ocean.

Two communities near the point of discharge, petitioners Borough of Lavallette and Borough of Seaside Park, as well as an environmental-protection group and several concerned citizens, appealed the DEP decision to the Appellate Division. Petitioners claimed that DEP violated the Clean Water Act and the State Act. Specifically, they argued that DEP failed to comply with the Ocean Discharge Criteria (ODC), see 40 *C.F.R.* § 125 Subpart M (1985), before issuing the permit. Petitioners also alleged that the permit violated New Jersey's antidegradation policy, *N.J.A.C.* 7:9–4.5(d), because the agency allowed Ciba–Geigy to discharge effluent in which the level of seven pollutants was higher than that permitted by statute.

The Appellate Division affirmed in an unreported opinion. The court concluded that the ODC requirement relied on by petitioners, 40 *C.F.R.* § 125.122(a) (1985), was "not federally mandated to be part of New Jersey's regulation." In addition, the court determined that the presumption of no unreasonable degradation, 40 *C.F.R.* § 125.122(b) (1985), satisfied any ODC obligation. The court also found no violation of New Jersey's antidegradation policy, observing that Ciba–Geigy's 1985 permit imposed discharge restrictions at least as stringent as those under the 1977 permit.

Before us, petitioners argue that the court's conclusions concerning the Ocean Discharge Criteria and New Jersey's antidegradation policy are unsupported by the record because DEP failed to make the factual findings required under the applicable statutory and regulatory provisions.

## II.

### A.

Although administrative agencies generally act either through rulemaking or adjudication, *Texter v. Department of Human Servs.*, 88 *N.J.* 376, 384, 443 *A.*2d 178 (1982) (citing *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n*, 85

*N.J.* 325, 338, 426 *A.*2d 1000 (Handler, J., concurring), *appeal dismissed,* 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981); *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 154, 183 *A.*2d 64 (1962)), DEP's permitting process does not fit precisely into either category. *See Texter, supra,* 88 *N.J.* at 384, 443 *A.*2d 178. *See generally* 2 Davis, *Administrative Law* § 10:5 at 321–25 (2d ed. 1979) (noting inappropriateness of strict classification of agency action as adjudication or rulemaking because both procedures involve plurality of tasks). Rulemaking is a legislative-type function that usually involves policy judgments of widespread application within the agency's regulatory sphere. *Texter, supra,* 88 *N.J.* at 385, 443 *A.*2d 178; *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 329, 478 *A.*2d 742 (1984). Rulemaking may also "originate[ ] with and involve[ ] a specific party," *Bally Mfg. Corp., supra,* 85 *N.J.* at 342, 426 *A.*2d 1000 (Handler, J., concurring), and in that context the agency would tailor its procedure in order to "account for the individualized effect of its proposed action." *Id.* at 345, 426 *A.*2d 1000 (citations omitted). An adjudicatory procedure is typically a contested proceeding that may require a trial-type hearing, *N.J.S.A.* 52:14B–9(a), and thus resembles judicial action because it determines the rights of specific individuals or a limited group of individuals. *Texter, supra,* 88 *N.J.* at 384, 443 *A.*2d 178.

Agencies acting in an adjudicative capacity review evidence, make findings of fact, and exercise discretion in applying the law to those facts. *See In re Controlled Cable Corp.,* 95 *N.J.* 473, 484, 472 *A.*2d 130 (1984); *Kramer v. Board of Adjustment, Sea Girt,* 45 *N.J.* 268, 280, 212 *A.*2d 153 (1965); *Handlon v. Town of Belleville,* 4 *N.J.* 99, 105, 71 *A.*2d 624 (1950). Although DEP did not conduct a trial-type hearing in considering Ciba–Geigy's permit-renewal application, the agency reviewed extensive documentation submitted by both Ciba–Geigy and interested members of the public. Those documents included the application for a draft permit and its accompanying fact sheet, see *N.J.A.C.* 7:14A–9.2, as well as evidence offered

during the public-comment period. Thus, the permit-renewal process encompassed the presentation of evidentiary-type facts to the agency.

The agency's decision to grant or deny renewal undoubtedly "requir[ed] the exercise of a discretion or judgment judicial in nature * * *." *McFeely v. Board of Pension Comm'rs*, 1 *N.J.* 212, 216, 62 *A.*2d 686 (1948). Moreover, the agency's final determination constitutes an "administrative adjudication," see *N.J.S.A.* 52:14B–2(c), which affords a permittee the opportunity to contest that decision at a hearing. See *N.J.S.A.* 58:10A–7d. Under those circumstances, the NJPDES renewal process is best classified as a quasi-judicial procedure possessing some, but not all, of the elements of a traditional adjudicatory proceeding. *See, e.g., Juzek v. Hackensack Water Co.*, 48 *N.J.* 302, 225 *A.*2d 335 (1966) (holding that Water Policy and Supply Council of Department of Conservation and Economic Development performs quasi-judicial function in granting water utility permission to exercise power of condemnation); *Adolph v. Elastic Stop Nut Corp. of Am.*, 18 *N.J.Super.* 543, 87 *A.*2d 736 (App.Div.1952) (finding that Employment Board of Review performs quasi-judicial function when reviewing and reopening employment application); *Barton Contracting Co., Inc. v. City of Afton*, 268 *N.W.*2d 712 (Minn.1978) (city council acts in quasi-judicial capacity when considering application for special-use permit); *State ex rel. Mc Nary v. Hais*, 670 *S.W.*2d 494, 496 (Mo.1984) (*en banc*) (county council's issuance of conditional-use permit was quasi-judicial decision).

■ Fact-finding is a basic requirement imposed on agencies that act in a quasi-judicial capacity:

> It is axiomatic in this State by this time that an administrative agency acting *quasi*-judicially must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for the salutary purpose of informing the interested parties and any reviewing tribunal of the basis on which the final decision was reached so that it may be readily determined whether the result is sufficiently and soundly grounded or derives from arbitrary, capricious or extra-legal considerations. [*In re Application of Howard Savings Inst.*, 32 *N.J.* 29, 52, 159 *A.*2d 113 (1960) (citations omitted).

An agency must engage in fact-finding to the extent required by statute or regulation, and provide notice of those facts to all interested parties. This requirement is "far from a technicality and is a matter of substance." *New Jersey Bell Tel. Co. v. Communications Workers of Am.,* 5 *N.J.* 354, 375, 75 *A.*2d 721 (1950). In addition, fact-finding ensures that agencies act within the scope of their delegated authority, *Mackler v. Board of Educ., City of Camden,* 16 *N.J.* 362, 370, 108 *A.*2d 854 (1954) (citation omitted), and also facilitates appellate review:

> [N]o matter how great a deference the court is obliged to accord the administrative determination which it is being called upon to review, it has no capacity to review at all unless there is some kind of reasonable factual record developed by the administrative agency and the agency has stated its reasons grounded in that record for its action. [*State v. Atley,* 157 *N.J.Super.* 157, 163, 384 *A.*2d 851 (App.Div.1978) (citations omitted).]

When an agency's decision is not accompanied by the necessary findings of fact, the usual remedy is to remand the matter to the agency to correct the deficiency. *DiMaria v. Board of Trustees, Pub. Employees' Retirement Sys.,* 225 *N.J.Super.* 341, 347, 542 *A.*2d 498 (App.Div.), *cert. denied,* 113 *N.J.* 638, 552 *A.*2d 164 (1988) (citations omitted); *see, e.g., Perez v. Pantasote, Inc.,* 95 *N.J.* 105, 469 *A.*2d 22 (1984) (disability case remanded because Judge of Compensation failed to set forth adequate fact-findings); *Katz v. Township of Howell,* 67 *N.J.* 51, 335 *A.*2d 14 (1975) (remanding matter to Division of Workmen's Compensation to make specific findings regarding extent of disability). A remand in this case is pointless, however, because the permit has expired. Nonetheless, we address the procedural concerns raised by petitioners regarding the Ocean Discharge Criteria and the antidegradation policy to ensure that pending and future permit proceedings include adequate fact-finding by DEP. (Because aspects of our holding will have only prospective application, our analysis is based on a review of the current administrative regulations, not those in effect when the agency issued the final permit.)

## B.

### Ocean Discharge Criteria

The overriding goal of the Clean Water Act "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 *U.S.C.* § 1251(a). To achieve that objective, Congress imposed limitations on the discharge of pollutants into the navigable waters and enacted guidelines called the "Ocean Discharge Criteria" (ODC), 33 *U.S.C.* § 1343, to regulate that discharge. The ODC apply to discharges "into the territorial sea, the waters of the contiguous zone, [and] the oceans * * *." *Ibid.*

Pursuant to 33 *U.S.C.* § 1343(c), the EPA promulgated regulations for determining the permissible discharge level of pollutants into the ocean. 40 *C.F.R.* § 125.120 to –.124 (1985). Before issuing a permit, the EPA must determine whether the proposed discharge level will cause unreasonable degradation of the marine environment,[1] based on its consideration of ten factors. 40 *C.F.R.* § 125.122(a) (1985). Those factors include the importance of the receiving water area to the surrounding biological community, 40 *C.F.R.* § 125.122(a)(4) (1985), and the potential impact on human health. 40 *C.F.R.* § 125.122(a)(6) (1985). If the discharge complies with the State's water-quality standards, however, the EPA can presume that the discharge does not "cause unreasonable degradation of the marine environment, for any specific pollutants or conditions specified in the variance or the standard." 40 *C.F.R.* § 125.122(b) (1985).

---

[1]"Unreasonable degradation of the marine environment" means:

(1) Significant adverse changes in ecosystem diversity, productivity and stability of the biological community within the area of discharge and surrounding biological communities,

(2) Threat to human health through direct exposure to pollutants or through consumption of exposed aquatic organisms, or

(3) Loss of esthetic, recreational, scientific or economic values which is unreasonable in relation to the benefit derived from the discharge.

[40 *C.F.R.* § 125.121(e) (1985).]

 Petitioners contend that the Ocean Discharge Criteria are a mandatory aspect of DEP's regulatory scheme. Neither the Act nor the implementing regulations expressly require a permittee to prove compliance with the ODC before the agency can issue an NJPDES permit.

The Appellate Division concluded that DEP need not incorporate the ODC in its NJPDES-review procedure because those criteria are not included in 40 *C.F.R.* § 123.25(a) (1989), the EPA's list of regulatory sections applicable to all states. We need not address the issue in great detail, but note our disagreement with the court below for two reasons.

First, the Clean Water Act clearly states that anyone who discharges pollutants into the ocean must comply with the ODC and obtain a permit. 33 *U.S.C.* § 1343(a). Second, although the regulation relied on by the Appellate Division, 40 *C.F.R.* § 123.25(a) (1989), contains restrictions imposed on *all* states, not every state is adjacent to an ocean or territorial sea. There is no reason to require a landlocked state to comply with the ODC. Thus, the omission of the Ocean Discharge Criteria from the list of regulations applicable to *all* states set forth in 40 *C.F.R.* § 123.25(a) (1989) undoubtedly reflects no more than the reality that the ODC apply only to states that can discharge pollutants into an ocean, territorial sea, or waters of a contiguous zone. Thus, we are satisfied that 40 *C.F.R.* § 123.25(a) (1989) is not the sole federal regulation containing permit restrictions applicable to states such as New Jersey. We find therefore that the ODC provisions must be satisfied before DEP can issue an NJPDES permit.

Although DEP did not incorporate the ODC as a permit requirement in its regulations, the Appellate Division concluded that the Ciba–Geigy permit satisfied the Ocean Discharge Criteria because the presumption of no unreasonable degradation applied. *See* 40 *C.F.R.* § 125.122(b) (1985). That provision specifies that "[d]ischarges in compliance with * * * State water quality standards shall be presumed not to cause unrea-

sonable degradation of the marine environment, for any specific pollutants or conditions specified in * * * the standards." *Ibid.* Ciba–Geigy maintains that its discharge complied with *N.J.A.C.* 7:14A–3.14 and Appendix F, which establish effluent limitations for NJPDES permits. According to Ciba–Geigy, compliance with that regulation satisfies New Jersey water-quality standards, and therefore, DEP's reliance on the ODC presumption was proper. Petitioners disagree and contend that the water-quality standards include only the "Water Pollution Control" regulations, *N.J.A.C.* 7:9–1.1 to –15.12, and that Ciba–Geigy's discharge failed to comply with those provisions.

We need not address the merits of either position on that issue because it is conceded that DEP, during the permit-renewal process, did not rely on the presumption to ensure compliance with the ODC. Moreover, the agency never determined whether, based on the factors listed in 40 *C.F.R.* § 125.122(a) (1985), the discharge would cause an unreasonable degradation of the marine environment. The impediment to judicial review is that there is nothing in the draft permit, the hearing examiner's report, the final permit, or elsewhere in the record that indicates how DEP concluded that Ciba–Geigy's permit complied with the ODC. To that extent the agency's proceedings were insufficiently specific to enable the reviewing court to evaluate its decision. *New Jersey Bell Tel. Co., supra,* 5 *N.J.* at 375, 75 *A.*2d 721. That deficiency must be addressed in any subsequent proceedings concerning the renewal of a permit.

## C.

### Antidegradation Policy

In general, an antidegradation policy seeks to maintain and protect the existing uses [2] of the water, *N.J.A.C.* 7:9–4.5(d)(2),

---

[2]"Existing uses" means those uses actually attained in the waterbody on or after November 28, 1975, whether or not they are included in the State's water quality standards. *N.J.A.C.* 7:9–4.4.

as well as to improve water quality. *Cf. New Jersey Builders Ass'n v. Department of Envtl. Protection,* 169 *N.J.Super.* 76, 83, 404 *A.2d* 320 (App.Div.) (observing that "the water quality standards and permit programs developed pursuant [to the Water Pollution Control Act] are to ensure that water pollution will not worsen"), *certif. denied,* 81 *N.J.* 402, 408 *A.2d* 796 (1979). The Clean Water Act requires each State to "adopt a statewide antidegradation policy." 40 *C.F.R.* § 131.12(a) (1987). The policy must be included in each State's water-quality standards submitted to the EPA for review. 40 *C.F.R.* § 131.6(d) (1987).[3]

Pursuant to the federal mandate, DEP adopted its antidegradation policy, see *N.J.A.C.* 7:9–4.5(d), and enacted a variety of provisions to ensure compliance with that policy. It is self-evident that the purpose of the antidegradation policy is to protect existing water uses and to maintain present water quality. No irreversible changes may be made to existing water quality that would impair or preclude attainment of the designated uses of a waterway. *N.J.A.C.* 7:9–4.5(d)(3). In addition, before water quality can be diminished for certain waters, DEP must first determine that the lower water quality furthers other societal interests:

> Where water quality exceeds levels necessary to support the designated uses, including but not limited to, propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the Department finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the Department's continuing planning process as set forth in this subchapter, that allowing lower water quality is necessary to accommodate important economic or societal development in the area in which the waters are located. [*N.J.A.C.* 7:9–4.5(d)(5).]

The antidegradation policy also classifies New Jersey waters into four categories. *N.J.A.C.* 7:9–4.5(d)(6). Each category

---

[3] A water quality standard defines the water quality goals of a waterbody by designating the uses to be made of the water and by establishing the criteria necessary to protect the uses. 40 *C.F.R.* § 131.2 (1987). Among its other laudable goals, the state Act seeks "to enhance the domestic, municipal, recreational, industrial and other uses of water." *N.J.S.A.* 58:10A–2.

provides different protections from changes to its existing water quality. Ciba–Geigy discharges effluent from its Toms River facility into "Category Two" waters. See *N.J.A.C.* 7:9–4.- 5(d)(6)(iv). In that category, the agency must review appropriate studies to ensure that the water's quality is preserved and that the existing uses are safeguarded:

> For Category Two waters, water quality characteristics that are generally better than, or equal to, the water quality standards shall be maintained within a range of quality that shall protect the existing/designated uses, as determined by studies acceptable to the Department, relating existing/designated uses to water quality. Where such studies are not available or are inconclusive, water quality shall be protected from changes that might be detrimental to the attainment of the designated uses or maintenance of the existing uses. Water quality characteristics that are generally worse than the water quality criteria shall be improved to meet the water quality criteria. [*Ibid.*]

In addition to enacting those antidegradation provisions, DEP also established numerous other requirements that must be satisfied before an NJPDES permit can be issued. *N.J.A.C.* 7:14A–1.1 to –14.8. Those requirements include various monitoring provisions, technology-based effluent limitations, and water quality standards "in addition to or more stringent than promulgated effluent limitations guidelines or standards * * *." [4] *N.J.A.C.* 7:14A–3.13(a)(1), (4), (9). Moreover, a renewal permit must contain "limitations, standards or conditions which are at least as stringent as the final limitations, standards, or conditions in the previous permit * * *." *N.J.A.C.* 7:14A–3.13(a)(12)(i). [5]

---

[4]The Clean Water Act defines "effluent limitation" as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 *U.S.C.* § 1362(11).

[5]It is undisputed that Ciba–Geigy's 1985 permit imposes restrictions "at least as stringent" as the 1977 permit and thus, complies with *N.J.A.C.* 7:14A–3.- 13(a)(12)(i), the so-called "antibacksliding" regulation. We need not decide, however, whether compliance with the antibacksliding regulation satisfies New Jersey's antidegradation policy.

It is in this regulatory context that we review the Appellate Division decision concerning antidegradation. As indicated earlier, the court found that the 1985 permit did not violate the agency's antidegradation policy. The court based that holding, in part, on a regulatory provision in effect when the permit was issued. The former regulation, *N.J.A.C.* 7:9–5.12(a)(1)(ii)(1), like its current version, *N.J.A.C.* 7:9–4.5(d)(5), allows DEP to reduce the quality of certain high-quality waters after the agency finds that the degradation is "necessary to accommodate the important economic or social development in the area in which the waters are located." *Ibid.*

DEP, however, did not rely on that regulation to satisfy its antidegradation obligation. Moreover, even if DEP had decided to lower water quality under that provision, it would have been required to make a special finding that the degradation was necessary for economic or social reasons. The agency concedes that it never made such a finding.

The issuance of the permit raises a second procedural concern. The quality of the waters into which Ciba–Geigy discharges its effluent, classified as Category Two waters, must "be maintained within a range of quality that shall protect the existing/designated uses, *as determined by studies* acceptable to the Department, relating existing/designated uses to water quality." *N.J.A.C.* 7:9–4.5(d)(6)(iv) (emphasis added). The record contains no indication that DEP relied on any studies before deciding whether the proposed discharge would maintain water quality within the permitted range.

### III.

The record reveals that DEP satisfied various statutory and regulatory requirements in its review of Ciba–Geigy's application. See *N.J.S.A.* 58:10A–9. The agency solicited, responded to, and considered written comments submitted by elected officials, environmental groups, and concerned citizens before making a determination concerning the final permit. See *N.J.S.A.*

58:10A–9b; *N.J.A.C.* 7:14A–8.1, –8.2, –8.7. In addition, DEP held a public hearing, see *N.J.S.A.* 58:10A–9d; *N.J.A.C.* 7:14A–8.3, and made available extensive documentation and information concerning the proposed discharge. See *N.J.S.A.* 58:10A–9c; *N.J.A.C.* 7:14A–8.4. The draft permit contained discharge limitations and monitoring requirements for various effluent characteristics. The final permit imposed similar restrictions, but also required Ciba–Geigy, among other things, to maintain the discharge pipeline and to monitor ocean water at beaches near the points of discharge. Interested parties and members of the public appear to have been well informed about most significant aspects of Ciba–Geigy's renewal application.

In at least two important respects, however, the agency did not fulfill its role as fact-finder. First, DEP never made any finding that the discharge complied with the ODC. See *supra* at 175–177, 576 *A.*2d at 789–791. In the future, the agency must determine whether a final permit satisfies the ODC and must state in both the draft and final permit whether its finding is based on the criteria contained in 40 *C.F.R.* § 125.122(a) (1985) or on the presumption of no unreasonable degradation. See 40 *C.F.R.* § 125.122(b) (1985). The findings should be adequately supported by the record and carefully explained:

> [The] findings of fact [must] be sufficiently specific under the circumstances of the particular case to enable the reviewing court to intelligently review an administrative decision and ascertain if the facts upon which the order is based afford a reasonable basis for such order. [*New Jersey Bell Tel., supra*, 5 *N.J.* at 377, 75 *A.*2d 721.]

Second, the record did not indicate clearly how the permit comported with New Jersey's antidegradation policy. If, for example, a discharge seeks to reduce the quality of waters below the level "necessary to support the designated uses, including but not limited to, propagation of fish, shellfish, and wildlife and recreation in and on the water," *N.J.A.C.* 7:9–4.5(d)(5), DEP, as required by that regulation, must find that the diminution in water quality advances "important eco-

nomic or social development in the area in which the waters are located." *Ibid.* Any such finding should include an adequate description of the economic or societal interest that is advanced.

■■■ A related concern involves permits, such as Ciba–Geigy's, that allow discharges into "Category Two" waters. With respect to these waters, DEP should determine from "studies acceptable to the Department," *N.J.A.C.* 7:9–4.5(d)(6)(iv), whether the proposed discharge maintains water-quality characteristics "within a range of quality that shall protect the existing/designated uses * * *." *Ibid.* The agency should describe what, if any, studies it relies on in making that determination. If such studies are unavailable or inconclusive, DEP must make findings demonstrating that no changes to water quality occur "that might be detrimental to the attainment of the designated uses or maintenance of the existing uses." *Ibid.*

Thus, deficiencies in the renewal process derive from DEP's duty to make factual findings that are prerequisite to the issuance of a permit. By failing to make essential findings of fact on the record, *supra* at 175–176, 179, 576 *A.*2d at 789–790, 792, DEP inhibited judicial review, requiring the reviewing court to speculate about the basis of its conclusions. *Cunningham v. Department of Civil Serv.,* 69 *N.J.* 13, 26, 350 *A.*2d 58 (1975). An "administrative agency must set forth basic findings of fact * * * so that the parties and any reviewing tribunal will know the basis on which the final decision was reached." *Riverside Gen. Hosp. v. New Jersey Rate Setting Comm'n,* 98 *N.J.* 458, 468, 487 *A.*2d 714 (1985). By making such findings, an administrative agency provides an adequate record for appellate review and affords the public the opportunity to contest those conclusions.

■■■ As noted, the permit in issue expired on June 30; hence, the issues presented on this appeal are moot. Accordingly, we dismiss the appeal.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.