**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0832-23

IN THE MATTER OF
APPLICATION TO NEW JERSEY
TURNPIKE AUTHORITY FOR
LICENSE TO CROSS NUMBER
P971.

_____

Argued December 3, 2025 – Decided April 21, 2026

Before Judges Gummer, Paganelli, and Vanek.

On appeal from the New Jersey Turnpike Authority.

Jason N. Sena argued the cause for appellants Estate of James Viviano, Nancylu Viviano Mannuccia, Thomas J. Viviano, Roseanne Caldarise and Anita Pfefferkorn (Archer & Greiner, PC, attorneys; Patrick M. Flynn and Jason N. Sena, on the briefs).

Alessandro Rinaldo Di Stefano argued the cause for respondent New Jersey Turnpike Authority (De Cotiis, Fitzpatrick, Cole & Giblin, LLP, attorneys; Alessandro Rinaldo Di Stefano, on the brief).

PER CURIAM

Petitioners Estate of James Viviano, Nancylu Viviano Mannuccia,

Thomas J. Viviano, Roseanne Caldarise, and Anita Pfefferkorn own property

abutting the Garden State Parkway (Parkway).[1]  After obtaining final subdivision and site plan approval from the Township of Washington Planning Board, petitioners applied for a license to cross in order to install stormwater infrastructure within the Parkway's right-of-way, which would include stormwater discharge to the existing concrete swale and use of a maintenance access driveway.  The New Jersey Turnpike Authority (NJTA) denied the application in an October 4, 2023 final agency decision, and petitioners appealed.  Because the decision was arbitrary, capricious, and unreasonable, we vacate it and remand the matter for further proceedings consistent with this opinion.

I.

In 1957, James Viviano (Viviano) and other members of his family sold a tract of land to NJTA's predecessor entity, the New Jersey Highway Authority. The New Jersey Highway Authority later used the land to build a portion of the Parkway.  Viviano retained title to an unimproved wooded area (the property) adjacent to the Parkway, which was comprised of approximately fourteen acres

---

[1]  James Viviano died on May 10, 2019.  The petitioners are his estate and children.

A-0832-23

and located at Block 1305, Lot 1.05 and Block 1306, Lot 2 on the Township's tax map.

Viviano began efforts to develop the property and in 1999 filed a lawsuit against the Township and the Planning Board pursuant to South Burlington County NAACP v. Township of Mount Laurel, 92 N.J. 158 (1983). The parties subsequently settled that case and the Law Division approved the settlement in 2001. The settlement agreement required the Township to amend its master plan and ordinances to allow Viviano to construct single-family and multi-family homes on the property. In addition, the settlement provided that, in lieu of constructing affordable-housing units, Viviano would contribute $375,000 to the Township's affordable housing trust fund. On June 30, 2004, the Planning Board granted Viviano preliminary major subdivision approval and preliminary major site plan approval.

Although petitioners did not file the application for the license to cross the Parkway's right-of-way until June 2023, the record shows Viviano and NJTA had been discussing the development of the property as early as 2004. In December 2004, NJTA sent Viviano's engineer an application for a utility permit, and the subsequent application shows Viviano sought permission to

3

install a "[s]torm [s]ewer and [h]eadwall," connecting his proposed stormwater management system to the Parkway's storm drainage infrastructure.

In an April 27, 2005 letter to Brian P. O'Leary, who was NJTA's highway engineer, HNTB Corporation (HNTB), which was NJTA's consultant, provided comments on the proposed stormwater management system. The proposal included building a headwall, detention basin, and scour hole on NJTA's right-of-way.[2] HNTB observed that "the proposed flow will be added to the existing concrete swale along the . . . Parkway in a concentrated manner, rather than gradually as it does today," and, therefore, recommended "that the hydraulic capacity of the swale be checked to verify that no erosion will take place." HNTB also asked whether the contractor building the stormwater system would need access to the Parkway's right-of-way from the property and who would be responsible for maintaining the drainage system. HNTB suggested NJTA require "[d]etails of the block wall that is to be constructed at the outfall headwall of the [detention] basin on the . . . Parkway property" and re-evaluation and re-design of the proposed detention basin based on "the most current rainfall

---

[2] A detention basin is "a human-made impoundment area made by constructing an embankment, or excavating a pit, or both, for the purposes of temporarily storing stormwater." N.J.A.C. 7:7A-1.3. Scour holes have been described as "stabilization measures," N.J.A.C. 7:13-11.1(b)(5), or "[e]nergy dissipation structures," N.J.A.C. 7:7A-7.11 (a)(6).

A-0832-23

rate" as required by the New Jersey Department of Environmental Protection (NJDEP). In a June 27, 2005 letter to Viviano, O'Leary deemed the application incomplete, listing items he had to address.

In an October 23, 2006 letter, NJTA advised the Planning Board it "ha[d] not had adequate time to review the plans" submitted for Viviano's pending application. Nevertheless, it identified several concerns and stated it had "no objections to the proposed project provided that all of [its] concerns . . . [we]re addressed to [its] satisfaction." In an October 26, 2006 letter, Brian Murphy, Viviano's engineer, responded point-by-point to each of the issues identified in HNTB's April 27, 2005 letter and submitted revised site development plans and a stormwater management plan. On November 17, 2006, he sent NJTA a "Stormwater Management Report." On December 7, 2006, HNTB sent NJTA comments on the latest submissions, identifying five areas of additional or outstanding information NJTA should request regarding the detention basin, the capacity of the existing concrete swale to handle additional flow, and the proposed scour hole.

In a January 31, 2007 letter, NJTA advised the Planning Board it had "no objections to the proposed project provided that all of [NJTA's] concerns . . . , and/or any future concerns are addressed to [NJTA]'s satisfaction." NJTA

identified eleven issues. In relevant part, NJTA was "concerned with the discharge of site drainage directed towards the Parkway" and advised that "post development drainage rates [should] not exceed the predevelopment rates." NJTA also noted "[t]he proposed location for this application may be affected by future . . . Parkway widening. Therefore, every effort should be made to keep all improvements away from the . . . Parkway's right-of-way." Finally, NJTA stated any encroachment onto the right-of-way was prohibited and any access into the right-of-way "may require a [t]raffic [p]ermit and/or [l]icense to [c]ross." The letter also included the comments from HNTB's December 7, 2006 letter. Murphy responded to NJTA's letter on February 22, 2007, and submitted additional documents, including "Revised Major Subdivision Plans."

On May 28, 2013, Murphy sent a letter to NJTA, referencing and again responding to its January 31, 2007 letter.[3] In that letter, Murphy stated, "[t]he applicant will obtain a traffic permit and/or [l]icense to cross from [NJTA] if required[;] however it is of our opinion that one is not required."

---

[3] The record contains an apparently revised site development plan dated April 17, 2013. The record does not otherwise contain documents explaining what transpired between the February 22, 2007 and May 28, 2013 letters. It is uncontested that the April 17, 2013 plan does not depict any proposed intrusions into NJTA's right-of-way.

A-0832-23

According to petitioners, a July 15, 2013 revised site plan was created and submitted in response to a June 26, 2013 letter from NJTA. NJTA denies Viviano provided it with the July 15, 2013 revised site plan. The record does not contain a copy of the June 26 letter or proof showing the revised plan was sent to NJTA. It is uncontested that the July 15, 2013 site plan depicts a scour hole, rip rap channel, timber guide rail, block wall, and detention basin within NJTA's right-of-way.

In a December 26, 2014 letter, Michael Grant, a senior project engineer for NJTA, advised Murphy that NJTA had "received and reviewed the revised [s]ite [p]lan . . . and associated correspondence related to addressing earlier comments provided by [NJTA] on the initial [p]lan submission" and that "[a]ll prior comments have been adequately addressed to the satisfaction of [NJTA]." It is not clear from the record which revised site plan he was referencing. Grant also stated that because "all the proposed improvements are now outside of the . . . right-of-way," Viviano did not need to obtain a traffic permit from NJTA, but he would have to obtain one if he needed to access the site from NJTA's right-of-way.

A-0832-23

On March 23, 2018, Viviano applied for tentative approval of an amended preliminary and final major site plan before the Planning Board.[4] Approximately a week prior to a September 26, 2018 Planning Board hearing, NJTA sent a letter to Viviano's attorney, stating it had "not had the opportunity to review the plans for this application" and it "reserve[d] the right to offer additional comments or object to the proposed development" after review. NJTA represented it "[p]resently[] . . . ha[d] no objections to the proposed project provided that all of [its] concerns below, and/or any future concerns are addressed to [its] satisfaction." NJTA identified the same eleven comments from its January 31, 2007 letter. NJTA requested the letter "be read into the record of the hearing for purposes of documenting [NJTA's] concerns." (Emphasis omitted).

The plans were again revised, as memorialized in a March 9, 2021 amended preliminary major subdivision and site plan.[5] It is uncontested the

_____

[4] The record does not contain documents explaining what transpired between the December 26, 2014 letter and the March 23, 2018 application. According to petitioners, Viviano in the interim and in reliance on NJTA's purported "approval of the stormwater management plan . . . moved forward with the outside agency approval process."

[5] Other than an indication the Planning Board conducted hearings regarding the application in September and October of 2018 and May 2019, the record does

grading and drainage plan sheet depicted a scour hole, rip rap channel, timber guide rail, block wall, and detention basin within NJTA's right-of-way. Petitioners sought Planning Board approval of the amended plan and "Final Major Subdivision and Site Plan approval." The Planning Board scheduled a public hearing regarding the application to take place on September 22, 2021.

In a September 21, 2021 letter, NJTA advised petitioners it had not had an opportunity to review the amended plan and reserved its right to object to it if warranted by its review. It stated, however, it presently had no objections to the project provided petitioners addressed its stated concerns. NJTA identified seven areas of concern, which largely mirrored some of the concerns enumerated in its prior correspondence. In relevant part, NJTA stated it was "concerned with the discharge of site drainage directed towards the . . . Parkway. There also appears to be a proposed drainage feature traversing the [r]ight[-o]f[-w]ay line and into [NJTA]'s property." NJTA again advised petitioners they should ensure "the post development drainage rates do not exceed the predevelopment rates." NJTA also stated any encroachment within the right-of-way was "prohibited" and that "every effort should be made to keep all improvements away from the

---

not contain documents explaining what transpired between the September 18, 2018 letter and the March 9, 2021 amended plans application.

A-0832-23

. . . [r]ight-of-[w]ay."  NJTA again advised that petitioners might need "a [t]raffic [p]ermit and/or [a l]icense to [c]ross."

In a November 24, 2021 letter, NJTA advised petitioners' counsel it had reviewed the amended March 2021 plans, noting they depicted the placement of structures, including a scour hole, block wall, and timber guide rail, on NJTA's property.  NJTA also expressed concern the overflow from the proposed detention basin would overpower the existing concrete swale and inundate the roadway.  NJTA attached an October 13, 2021 letter HNTB had sent to NJTA after it reviewed the amended plans.  In that letter, HNTB stated the project "ha[d] permanent and temporary impacts on [NJTA's] property" and, consequently, required a license to cross.  HNTB also reiterated the concern that the stormwater discharge would exceed the capacity of the existing concrete swale.  HNTB also noted the design plan proposed constructing a block retaining wall on the right-of-way and advised that "[t]he developer should consider a design that does not construct permanent walls within" the right-of-way.

On January 19, 2022, the Planning Board granted final site plan and subdivision approval for the project.  The Planning Board's resolution required appellants to "obtain all required agency approvals and/or . . . review comments" from certain local and state agencies, including NJTA.

Petitioners submitted, using NJTA's form, a June 6, 2023 application for a "LICENSE TO CROSS," explaining the license was needed for "stormwater discharge to existing concrete [P]arkway swale and maintenance access driveway." Petitioners' application included copies of the preliminary and final major subdivision site plan, drainage area maps, and a stormwater management report.

NJTA submitted the application to HNTB and another consultant for review, and they evaluated it as an application for a "License to Cross." After receiving their comments, NJTA's chief engineer, Michael Garofalo, advised Murphy in a September 22, 2023 letter that NJTA had reviewed the June 6, 2023 application and was denying "the request to connect to [NJTA's] stormwater collection system." In the subject line of the letter, Garofalo stated he was providing "[i]nitial [r]eview [c]omments" on petitioners' "License to Cross." Garofalo did not indicate in the letter he had sent a copy of it to NJTA's executive director, James Carone, or that Carone was aware of or had participated in the denial. See N.J.A.C. 19:9-5.2(c) (2017) (providing "[t]he Chief Engineer may approve or reject an application for a license to cross, subject to the approval of the Executive Director"). Garofalo identified seven

concerns NJTA had "with accepting the proposed development" but did not address the criteria required in the applicable regulation, N.J.A.C. 19:9-5.2.

In an October 2, 2023 protest letter, see N.J.A.C. 19:9-5.5, petitioners' counsel asserted petitioners had "sufficiently addressed [NJTA's] concerns" and responded to each of them:

> 1. In response to the recently implemented NJDEP Inland Flood Protection rules, [NJTA] can no longer continue with the practice of direct connections into our stormwater collection system utilizing legacy criteria.
>
> [Petitioners'] Response: The . . . application is exempt from the recently implemented NJDEP Inland Flood Protection rules pursuant to the grandfathering provisions of said rules.
>
> 2. The applicant has not demonstrated that the peak flows in the future condition are reduced utilizing current regulatory standards.
>
> [Petitioners'] Response: The . . . application is exempt from the recently implemented NJDEP Inland Flood Protection rules pursuant to the grandfathering provisions of said rules.
>
> 3. [NJTA] does not have a level of comfort that maintenance of the basin will be adequately and routinely performed in perpetuity by the then Site owner in accordance with the stormwater management maintenance plan even if there is an agreement to do so recorded in the title of the Site.
>
> [Petitioners'] Response: A homeowners association ("HOA") will be established to be responsible for the

12

maintenance of the basin. An easement will be provided to the Township of Washington, which can similarly be provided to [NJTA], that would give each entity the right to maintain the basin and assess the lots in the community for any costs should the HOA not proper[l]y maintain the basin. This language will be included in the HOA documents themselves and can be similarly set forth in a separately recorded instrument.

4. The applicant has not demonstrated to the [NJTA]'s satisfaction that maintenance of [NJTA]'s stormwater collection system will not be adversely impacted by the applicant's proposed basin or increased stormwater volumes over time.

[Petitioners'] Response: The [petitioners] submit[] that [they] ha[ve] met the required stormwater reductions for the existing impacts to [NJTA]'s stormwater collection system; therefore, [NJTA]'s collection system will not be adversely impacted by the applicant's proposed basin or increased stormwater volumes over time. In addition, the . . . application is exempt from the recently implemented NJDEP Inland Flood Protection rules pursuant to the grandfathering provisions of said rules.

5. The classification of the basin as a dam has not been reviewed by the NJDEP Dam Safety Unit.

[Petitioners'] Response: Based on [petitioners'] review of the pertinent regulations, the basin does not qualify as a dam. However, even if the basin is determined to be a dam, such determination would only impose certain inspection and reporting requirements, and would not affect [NJTA]'s review of this application.

6. The spillway of the basin directs flow onto the Parkway which is not acceptable to [NJTA].

13

[Petitioners'] Response: The site's drainage currently is directed to the . . . Parkway . . . property. There is nearly a 40 foot decrease in elevation from Van Emburgh Avenue to the shared property line with the Parkway. There is no other feasible location of a spill way.

7. The installation of drainage infrastructure and associated retaining wall on [NJTA's r]ight-of-[w]ay is not acceptable to [NJTA].

[Petitioners'] Response: In order to provide a stable condition between the discharge from the basin and the Parkway swale it is necessary to install the rip rap as shown on the plan. Due to the grade change across this area, the southerly wall is necessary to contain the water within the rip rap area. [NJTA] previously requested the vehicular access; however, if [NJTA] no longer wants vehicular access, then the wall to the north could most likely be eliminated. The [petitioners] ha[ve] Soil Conservation District approval for the community.

[(Emphasis omitted).]

Petitioners' counsel requested NJTA grant the application for a license to cross or hold a hearing pursuant to N.J.A.C. 19:9-5.5(b) if Garofalo's letter constituted a formal rejection of the application.

NJTA's Acting Director of Law, Ann Christine Monica, responded in an October 4, 2023 letter. In the subject line of the letter, she referenced the application for the "License to Cross." Describing herself as the "designee of the Executive Director" and her response as "a final agency decision," she stated

14

NJTA had denied petitioners' protest for the reasons set forth in the September 22, 2023 letter and would not conduct a hearing.

Petitioners appeal that decision. They argue the denial of the application for a license to cross was not based on sufficient, credible evidence; was arbitrary, capricious, and unreasonable; constituted illegal rule-making in violation of the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -31; and violated New Jersey's public policy favoring the construction of affordable housing. They also contend NJTA was equitably estopped from denying the license-to-cross application after purportedly preliminarily approving their project in its December 26, 2014 letter.

## II.

As a threshold matter, we address petitioners' equitable-estoppel argument.

The doctrine of equitable estoppel "is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment." Knorr v. Smeal, 178 N.J. 169, 178 (2003). The doctrine requires a plaintiff to "show that [the] defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment." Ibid. "[E]quitable estoppel

15

is 'rarely invoked against a governmental entity, . . . . Nonetheless, equitable considerations are relevant to assessing governmental conduct, and may be invoked to prevent manifest injustice.'" Tasca v. Bd. of Trs., Police & Firemen's Ret. Sys., 458 N.J. Super. 47, 60 (App. Div. 2019) (omission in original) (quoting In re Johnson, 215 N.J. 366, 378-79 (2013)); see also In re Protest Filed by El Sol Contr. & Constr. Corp., 260 N.J. 362, 373 (2025) (finding equitable estoppel is rarely applied against a government entity "when the application . . . would 'hinder or prejudice essential governmental functions.'" (quoting Vogt v. Borough of Belmar, 14 N.J. 195, 205 (1954))).

Petitioners contend NJTA is estopped from denying their application for a license to cross because it had not "object[ed] to the stormwater management plan before the Planning Board and had previously approved the same stormwater infrastructure that [petitioners] now seek to construct," specifically referencing NJTA's December 26, 2014 letter. However, petitioners had not previously submitted a license-to-cross application, and NJTA had not had an opportunity to consider their application pursuant to the criteria required in N.J.A.C. 19:9-5.2. In its January 31, 2007 and September 21, 2021 letters, NJTA expressly reserved the right to object to the proposed project if its concerns or any future concerns were not addressed to its satisfaction; it

16

incorporated the September 21, 2021 letter in its November 24, 2021 letter. We cannot discern whether Grant based the statement in the December 26, 2014 letter that "[a]ll prior comments have been adequately addressed to the satisfaction of [NJTA]" on the April 17, 2013 plan, which did not include any proposed structures on the right-of-way, or the July 15, 2013 revised site plan, which depicted structures on the right-of-way. After the December 26, 2014 letter, petitioners submitted revised plans to the Planning Board. On that record, petitioners have not established equitable estoppel.

III.

Judicial review of an agency action is "limited." In re Protest Filed by El Sol, 260 N.J. at 373 (quoting In re Musick, 143 N.J. 206, 216 (1996)). We do not overturn an agency's decision unless it was "arbitrary, capricious, or unreasonable." Ibid. "The burden to make that showing 'rests upon the [party] challenging the administrative action.'" Ibid. (alteration in original) (quoting Lavezzi v. State, 219 N.J. 163, 171 (2014)). A reviewing court, however, is not bound by an agency's interpretation of a statute or a purely legal issue. Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 158 (2018); see also In re Protest Filed by El Sol, 260 N.J. at 373 (finding "[a]ppellate courts

review legal conclusions, including those reached by an administrative agency, de novo").

Our review of an agency decision is generally limited to three questions:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Protest Filed by El Sol, 260 N.J. at 373-74 (quoting In re Quest Acad. Charter Sch., 216 N.J. 370, 385 (2013)).]

Under the first question, we consider whether an agency has comported with applicable law, including its own regulations. "Because administrative regulations that apply to the regulated public have the force and effect of statutory law, an administrative agency ordinarily must enforce and adhere to, and may not disregard, the regulations it has promulgated." Cnty. of Hudson v. Dep't of Corr., 152 N.J. 60, 70 (1997). In other words, once an agency uses its discretion to promulgate regulations, it cannot then choose to ignore those regulations. Ibid. "[A]lthough an administrative agency may change its regulations, so long as they are in force the agency is bound by them." Id. at 71.

18

Under the second question, we consider whether the agency "engage[d] in fact-finding to the extent required by statute or regulation, and provide[d] notice of those facts to all interested parties." In re Issuance of a Permit by Dep't of Env't Prot. to Ciba-Geigy Corp., 120 N.J. 164, 173 (1990); see also Musconetcong Watershed Ass'n v. N.J. Dep't of Env't Prot., 476 N.J. Super. 465, 488 (App. Div. 2023) (same). The obligation to engage in the required fact-finding is "'far from a technicality and is a matter of substance[,]' . . . [which] ensures that agencies act within the scope of their delegated authority." Ciba-Geigy, 120 N.J. at 173 (quoting N.J. Bell Tel. Co. v. Commc'n Workers of Am., 5 N.J. 354, 375 (1950)).

An agency's failure to make findings of fact or explain the basis for its decision "inhibit[s] judicial review, requiring the reviewing court to speculate about the basis of its conclusions." Id. at 181; see also Balagun v. N.J. Dep't of Corr., 361 N.J. Super. 199, 203 (App. Div. 2003) ("[W]e insist that the agency disclose its reasons for any decision, even those based upon expertise, so that a proper, searching, and careful review by [a] court may be undertaken."). "When an agency's decision is not accompanied by the necessary findings of fact, the usual remedy is to remand the matter to the agency to correct the deficiency."

A-0832-23

Ciba-Geigy, 120 N.J. at 173; see also In re Thomas Orban/Square Props., LLC, 461 N.J. Super. 57, 77-78 (2019) (same).

NJTA contends "[t]he arbitrary and capricious standard is irrelevant" here because in denying petitioners' license-to-cross application it was acting as a "private landowner" and, thus, was entitled to "the widest discretion." We disagree. The application of the arbitrary-and-capricious standard in a court's review of an agency's action is well established. N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 384-85 (2008) (reciting "the well-established principles that inform our review of the final decisions of administrative agencies," including "reversing those actions if they are 'arbitrary, capricious or unreasonable'" (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980))).

Moreover, the record does not support NJTA's contention that in denying the application, it was acting in a proprietary, not a regulatory, capacity. NJTA did not state in the October 4, 2023 final agency decision, or the September 22, 2023 letter it referenced, it was acting in a proprietary capacity. It did not make that assertion in any of the decades of correspondence exchanged between the parties.

To the contrary, the record establishes NJTA was acting in its regulatory capacity in addressing the applications before it, including the application for a license to cross. In its January 31, 2007 letter to the Planning Board, NJTA stated any access into the right-of-way "may require a [t]raffic [p]ermit and/or [l]icense to [c]ross." In its September 21, 2021 letter to petitioners, NJTA again advised petitioners might need "a [t]raffic [p]ermit and/or [l]icense to [c]ross." Petitioners ultimately submitted an application for a "LICENSE TO CROSS," pursuant to the regulation set forth in N.J.A.C. 19:9-5.2. NJTA sent the application to its consultants, who indicated in their responding letters they had reviewed it as an application for a "License to Cross." As its September 22 and October 4, 2023 correspondence confirms, NJTA considered the submission as an application for a "License to Cross."

Because petitioners applied for a license to cross and NJTA considered their submission as an application for a license to cross, NJTA was plainly acting in a regulatory capacity when it denied petitioners' application. In so doing, it was required to "follow the law," In re Quest Acad., 216 N.J. at 385, and adhere to the procedure set forth in the applicable regulation, N.J.A.C. 19:9-5.2. See Cnty. of Hudson, 152 N.J. at 70 (finding that once an agency promulgates a regulation, it must adhere to it); In re Appeal of Certain Sections of Unif. Admin.

21

Proc. Rules, 90 N.J. 85, 92-94 (1982) (finding an agency adjudicating an issue under its applicable regulations is performing a regulatory function). Given that NJTA's function in this matter was to "administer a regulatory scheme," its decision is subject to an arbitrary-and-capricious standard of review. Acoli v. N.J. State Parole Bd., 224 N.J. 213, 222 (2016). Accordingly, we consider its denial of petitioners' application under that standard.

When petitioners applied for the license to cross in 2023, N.J.A.C. 19:9-5.2(a) provided:

> A license to cross is a formal agreement with [NJTA] granting permission to enter upon or access the Roadway or other [NJTA] property. This normally pertains to public and private utilities that must occupy the property under, on, or over the Roadway in order to provide service to the public. In addition, licenses to cross are utilized by owners of property adjacent to the Roadway that must utilize the Roadway for drainage, egress, and access purposes.
>
> [N.J.A.C. 19:9-5.2(a) (2017).[6]]

NJTA amended the definition of a license to cross during the pendency of this appeal "to clarify [that] a license to cross . . . provides access to the Roadway or [NJTA] property for utility purposes only." 56 N.J.R. 321(a) (proposed Mar.

---

[6] "Roadway" is defined, collectively, as the Parkway and the New Jersey Turnpike. N.J.A.C. 19:9-1.1.

4, 2024) (emphasis added).  The amendment, effective January 6, 2025, limited the access to utilities and removed the sentence pertaining to adjacent property owners so that the regulation now states:

> A license to cross is a formal agreement with [NJTA] granting permission to enter upon or access the Roadway or other [NJTA] property.  This access pertains to public and private utilities that must occupy the property under, on, or over the Roadway in order to provide service to the public.
>
> [N.J.A.C. 19:9-5.2(a) (2025).]

In considering the application and meaning of the regulation, we are guided by the cornerstone principles of statutory construction, which apply equally to the interpretation of regulations.  "'Regulations are subject to the same rules of construction as a statute,' and 'should be construed in accordance with the plain meaning of [their] language' 'and in a manner that makes sense when read in the context of the entire regulation.'"  Seigel v. N.J. Dep't of Env't Prot., 395 N.J. Super. 604, 618 (App. Div. 2007) (alteration in original) (quoting Medford Convalescent & Nursing Ctr. v. Div. of Med. Assistance & Health Servs., 218 N.J. Super. 1, 5 (App. Div. 1985)).  To that end, "courts should avoid a construction that would render 'any word in the statute to be inoperative, superfluous or meaningless, or to mean something other than its ordinary meaning.'"  Norman v. N.J. State Parole Bd., 457 N.J. Super. 513, 520 (App.

23

Div. 2019) (quoting Calco Hotel Mgmt. Grp., Inc. v. Gike, 420 N.J. Super. 495, 503 (App. Div. 2011)).

NJTA now argues the license-to-cross regulation does not apply to petitioners' circumstances. NJTA contends N.J.A.C. 19:9-5.2(a) (2017) contemplated only two kinds of licenses to cross, one for applicants who sought access for utility purposes only and one for applicants who needed temporary access to NJTA's property. NJTA asserts that because petitioners did not fall into either of those categories, it appropriately denied the application. NJTA makes this argument even though it previously repeatedly took the position petitioners had to submit an application for a license to cross and did not include in its September 22 and October 4, 2023 letters the purported inapplicability of the regulation as a basis for its denial of petitioners' application. See In re Thomas Orban/Square Props., 461 N.J. Super. at 77 (finding "[a] state agency rendering a final agency decision must explain the specific reasons for its determination").

Guided by the applicable rules of statutory interpretation, we reject NJTA's interpretation of the language of the regulation as it existed at the time of petitioners' application. That overly-restrictive interpretation is directly contrary to the actual language of the regulation. See Reilly v. AAA Mid-

Atlantic Ins. Co. of N.J., 194 N.J. 474, 485 (2008) (finding courts do not defer to an agency's interpretation of a regulation if the interpretation is "plainly unreasonable" or "contrary to the [regulatory] language" (quoting In re N.J. Tpk. Auth. v. Am. Fed'n of State, Cnty., & Mun. Emps. Council 73, 150 N.J. 331, 351 (1997))). Although the pre-2025 regulation acknowledged a license to cross "normally pertains" to a utility company, it did not limit the issuance of licenses to cross to utility companies or to applicants seeking only temporary access. To the contrary, the regulation expressly provided for the issuance of licenses to cross to "owners of property adjacent to the Roadway that must utilize the Roadway for drainage, egress, and access purposes." N.J.A.C. 19:9-5.2(a) (2017). Indeed, petitioners satisfy the regulation as: owners of property adjacent to the right-of-way seeking to use it for "drainage, egress, and access purposes." Ibid.

Because the regulation applied to petitioners' application, NJTA had to follow it. When petitioners filed their application, N.J.A.C. 19:9-5.2(c) identified seven factors NJTA had to evaluate when determining whether to grant a license to cross:

1. Adherence to [NJTA]'s Standard Specifications;

2. The impact on the traveling public and the Roadway;

A-0832-23

3. The duration of the request;

4. The criteria contained in N.J.S.A. 27:23-1 [to -60], in particular, the provisions of N.J.S.A. 27:23-9, which must be taken into consideration concerning utilization of the Roadway for certain purposes;

5. The general concern exhibited by the applicant for the public health, safety, and welfare;

6. The financial health and stability of the applicant; and

7. The effect of the proposed crossing on the financial, economic, or engineering aspects of the activities of [NJTA], the public, or neighboring property owners.

[N.J.A.C. 19:9-5.2(c) (2017).[7]]

NJTA did not reference those required considerations or make factual findings about each of them in the September 22, 2023 letter or the October 4, 2023 final agency decision. NJTA's failure to "follow the law" by performing the required analysis rendered its final agency decision arbitrary, capricious, and unreasonable. Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995). "We cannot give deference to an agency's factfinding unless we have 'confidence that there has been a careful consideration of the facts in issue and

---

[7] The 2025 amendment added an eighth criteria: "[w]hether the lease of existing [NJTA] infrastructure is a viable alternative to a license to cross." N.J.A.C. 19:9-5.2(c) (2025).

appropriate findings addressing the critical issues in dispute.'" In re Thomas Orban/Square Props., 461 N.J. Super. at 77 (emphasis added) (quoting Bailey v. Bd. of Rev., 339 N.J Super. 29, 33 (App. Div. 2001)).  Because NJTA did not analyze the application under the governing regulation, its decision is not entitled to deference.

Accordingly, we vacate the October 4, 2023 denial of petitioners' application for a license to cross and remand the matter to NJTA with instructions to consider petitioners' application pursuant to the required elements of N.J.A.C. 19:9-5.2(c) (2017).  See Ciba-Geigy, 120 N.J. at 173; In re Thomas Orban/Square Props., 461 N.J. Super. at 77-78.  Because we remand on that basis, we do not address petitioners' remaining arguments.

Vacated and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division